**In re MEDIA ARTS GROUP, INC., Relator.**

No. 14–03–00180–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 23, 2003.

Eric J. Mayer, Steven J. Mitby, Houston, Timothy A. Beeton, Galveston, for relator.

A. Craig Eiland, Galveston, Charles W. Peckham, Houston, Clayton A.L. Davis, Maurice L. Tynes, Lake Charles, LA, for respondent.

## OPINION

HARVEY HUDSON, Justice.

Relator, Media Arts Group, Inc., seeks a writ of mandamus ordering respondent, the Honorable Susan E. Criss, to stay the underlying suit and compel arbitration. We conditionally grant the writ.

1. Although the real parties entitle themselves "and on Behalf of All Those Similarly Situated," there is no indication the underlying suit has been certified as a class action.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Media Arts is a California-based company that produces artwork based on Thomas Kinkade's paintings and sells it through gallery dealers throughout the United States. Real parties in interest, Bay Area Galleries, Inc., Rockbrook Galleries, Inc., and KY Arts, Inc. d/b/a/ Thomas Kinkade Signature Galleries of West Texas, and on behalf of all those similarly situated (collectively, the "Gallery Owners"),[1] contracted with Media Arts to sell Kinkade's artwork at their galleries in Texas and California. From 1998 to 2000, the Gallery Owners, through their officers, executed a total of seven "dealer agreements" for their various galleries. Alvin and Sandra Dahl executed two dealer agreements for Rockbrook Galleries, Inc. and four dealer agreements for Bay Area Galleries, Inc. Robert and Kathy Young executed one dealer agreement for KY Arts, Inc.

Each dealer agreement consists of three parts: (1) the basal dealer agreement; (2) Exhibit A (addressing the geographical district covered by the agreement); and (3) the Standard Terms and Conditions.[2] The dealer agreement and Exhibit A contain the parties-signatures. The Standard Terms and Conditions do not contain the parties-signatures (or any place for signatures), but they are attached to, and incorporated by reference into, the dealer agreement. Each Standard Terms and Conditions includes the following provision:

22. *Arbitration*

2. We will later address the Gallery Owners' contention that not all the dealer agreements were complete at they time they were executed; however, the record demonstrates what a complete dealer agreement presumably consists of.

THE PARTIES AGREE THAT ALL DISPUTES BETWEEN THEM SHALL FIRST BE SUBMITTED FOR INFORMAL RESOLUTION TO THEIR CHIEF EXECUTIVE OFFICERS, OR IF NO CHIEF EXECUTIVE OFFICER, TO THE OWNERS. ANY REMAINING DISPUTE SHALL BE SUBMITTED TO A PANEL OF THREE (3) ARBITRATORS WITH EACH PARTY CHOOSING ONE (1) PANEL MEMBER, AND THE THIRD PANEL MEMBER BEING CHOSEN BY THE FIRST TWO (2) PANEL MEMBERS. THE PROCEEDING SHALL BE CONDUCTED IN ACCORDANCE WITH THE COMMERCIAL ARBITRATION RULES OF THE AMERICAN ARBITRATION ASSOCIATION. THE AWARD OF THE ARBITRATORS SHALL INCLUDE A WRITTEN EXPLANATION OF THEIR DECISION. *THIS ARBITRATION PROCEEDING WILL BE BINDING UPON THE PARTIES.*

The Gallery Owners filed the underlying suit against Media Arts, Lightpost Publishing, Inc., Thomas Kinkade, and two Media Arts employees, Charles Sebring and Leon Mendez, pleading breach of contract, tortious interference with business relations, business disparagement, breach of fiduciary duties, breach of express and implied warranties, violations of the Deceptive Trade Practices Act ("DTPA"), and civil conspiracy. In essence, the Gallery Owners allege the defendants eliminated the Gallery Owners from the market by selling artwork directly to consumers at discount stores while requiring the Gallery Owners to sell at inflated prices.

Media Arts filed a motion in the trial court to stay the suit and compel arbitration. Media Arts also initiated an arbitration proceeding with the American Arbitration Association to recover $1,046,000 in unpaid invoices. After a hearing on December 19, 2002, the trial court orally denied Media Arts' motion. On January 31, 2003, the trial court entered a written order denying Media Arts' motion for reconsideration—this mandamus proceeding followed.

## II. STANDARD OF REVIEW

A party seeking to compel arbitration by mandamus must establish the existence of an arbitration agreement subject to the Federal Arbitration Act ("FAA") and that the claims at issue fall within the scope of the arbitration agreement. *See In re J.D. Edwards World Solutions Co.,* 87 S.W.3d 546, 549 (Tex. 2002); *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 753 (Tex.2001). If the arbitration agreement encompasses the claims at issue and there are no defenses to its enforcement, the court has no discretion but to compel arbitration and stay its own proceedings. *See J.D. Edwards,* 87 S.W.3d at 549; *FirstMerit,* 52 S.W.3d at 753–54. When a trial court erroneously denies a motion to compel arbitration under the FAA, the movant has no adequate remedy at law and is entitled to mandamus relief. *See J.D. Edwards,* 87 S.W.3d at 551; *FirstMerit,* 52 S.W.3d at 753.

## III. Discussion

In three issues, Media Arts contends it is entitled to mandamus relief because (1) it established the existence of an arbitration agreement subject to the FAA; (2) the Gallery Owners-claims fall within the scope of the arbitration agreement;[3] and

---

**3.** The Gallery Owners do not dispute that their claims fall within the scope of the arbitration agreements, if any. The arbitration agreements cover "all disputes" between the Gallery Owners and Media Arts, and the

(3) the Gallery Owners are required to arbitrate their claims against all defendants.[4] In response, the Gallery Owners challenge the existence of an arbitration agreement. They also assert several defenses to enforcement of the arbitration agreement, if any, including waiver, fraudulent inducement, and unconscionability.

### A. What Law Applies?

Preliminarily, we will address the disagreement among the parties regarding what law applies to this dispute. Media Arts contends the FAA applies because the dealer agreements involve interstate commerce, and the FAA preempts application of state law. The Gallery Owners contend California law applies because state contract law governs the arbitrability of disputes, and the dealer agreements contain California choice of law provisions.[5]

■ Media Arts is correct that the FAA makes enforceable arbitration agreements in contracts involving interstate commerce.

*See* 9 U.S.C. § 2 (1999);[6] *Allied-Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 273–74, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *In re Halliburton Co.*, 80 S.W.3d 566, 568 (Tex.2002). However, the Gallery Owners dispute that they agreed to arbitrate in the first place.[7] By its own terms, the FAA applies only where the parties have agreed to arbitrate. *See* 9 U.S.C. § 2. It was designed to overrule the judiciary's longstanding refusal to enforce arbitration agreements and place them upon the same footing as other contracts. *See Volt Info. Sci., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 225–26, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987). The FAA simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms. *See Volt*, 489 U.S. at 478, 109 S.Ct. 1248. It does not require parties to arbi-

---

claims arise from the contractual relationship created by the dealer agreements.

4. The Gallery Owners argued to the trial court that arbitration is not required because the other defendants are not parties to the arbitration agreements, if any. However, in response to the mandamus petition, the Gallery Owners do not dispute that they must arbitrate their claims against all defendants if required to arbitrate their claims against Media Arts. Although the Gallery Owners contracted with Media Arts only, they plead that all defendants are "one and the same" and responsible for the other's acts and plead no individual claims against the other defendants. *See In re Educ. Mgmt. Corp., Inc.*, 14 S.W.3d 418, 424–25 (Tex.App.Houston [14th Dist.] 2000, orig. proceeding) (compelling arbitration of claims against non-signatories to arbitration agreement because they were alter ego claims based on same operative facts and inherently inseparable from claims against signatory).

5. Each Standard Terms and Conditions contains the following provision: "This AGREEMENT shall be interpreted in accordance

with and governed by the laws of the state of California, county of Santa Clara, regardless of the place of its execution or performance."

6. Section 2 provides "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."

7. The Gallery Owners do not dispute that the dealer agreements involve interstate commerce. They are contracts between a California based company and Texas corporations for the distribution and sale of California artwork in Texas and California. Further, The Gallery Owners plead that their suit arises from Media Arts' business in Texas.

trate when they have not agreed to do so. *See id.*

■■■■■■ Generally, when deciding whether the parties agreed to arbitrate a certain matter, courts should apply ordinary state law principles governing the formation of contracts. *See First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995); *Halliburton,* 80 S.W.3d at 568. Therefore, while the FAA preempts application of state law that would render an existing arbitration agreement unenforceable, it does not preempt application of state law to determine the existence of an arbitration agreement. *See Halliburton,* 80 S.W.3d at 568–73 (applying FAA to compel arbitration after determining arbitration agreement existed under substantive Texas law); *Jack B. Anglin v. Tipps,* 842 S.W.2d 266, 271 (Tex.1992) (citing *Volt,* 489 U.S. at 478–79, 109 S.Ct. 1248, and stating FAA requires courts to compel arbitration when the parties *have so provided in their contract,* despite any state legislative attempts to limit the enforceability of arbitration agreements). Further, the FAA provides that arbitration agreements in contracts involving interstate commerce are enforceable "save upon such grounds as exist at law or in equity for the revocation of any contract." *See* 9 U.S.C. § 2. Therefore, generally applicable state contractual defenses may invalidate an arbitration agreement without contravening the FAA. *See Doctor's Assoc., Inc. v. Casarotto,* 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *In re AutoNation USA Corp.,* 105 S.W.3d 190, 198 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding).

Accordingly, to determine whether the FAA requires arbitration in this case, we must first determine, under state law, whether an arbitration agreement exists and whether the Gallery Owners proved any defenses to its enforcement. *See In re Oakwood Mobile Homes, Inc.,* 987 S.W.2d 571, 573 (Tex.1999) (stating once party seeking arbitration presents evidence of an arbitration agreement, burden shifts to opposing party to present evidence the agreement was unconscionable, induced or procured by fraud or duress, or that the other party waived its right to arbitrate). However, the Gallery Owners' contention that the parties chose California law to govern these issues presents a more difficult question.[8] Nevertheless, we need not resolve the choice of law issue because we find the existence of an arbitration agreement, and no defenses to its enforcement, under both California and Texas law. *See Fraud–Tech, Inc. v. Choicepoint, Inc.,* 102 S.W.3d 366, 377–78 (Tex.App.-Fort Worth 2003, no pet. h.) (citing *Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 419 (Tex. 1984) and holding court need not decide which state's law applies if no conflict exists on the issues); *Chesapeake Operating, Inc. v. Nabors Drilling USA, Inc.,* 94 S.W.3d 163, 168–69 (Tex.App.Houston [14th Dist.] 2002, no pet.) (reviewing Texas and Louisiana law on issue before conducting choice of law analysis because "we need not decide which law applies if it makes no difference.").

## B. Existence of An Arbitration Agreement

Owners cite Texas law in support of their position that no arbitration agreement exists. Media Arts does not focus on the choice of California or Texas law because it urges application of federal law; however, it cites some Texas law in support of its position.

---

**8.** The question is difficult because the California choice-of-law provision is only contained in the Standard Terms and Conditions; yet, the Gallery Owners vigorously deny the Standard Terms and Conditions were a part of all their dealer agreements. Further, after urging application of California law, the Gallery

■ To challenge the existence of an arbitration agreement, the Gallery Owners contend the Standard Terms and Conditions were not attached to all their dealer agreements at the time they were executed, and, therefore, they were unaware of the arbitration provisions contained therein. Specifically, Alvin Dahl testified the Standard Terms and Conditions were not attached when he executed his first dealer agreement.[9] Instead, he first saw the Standard Terms and Conditions several months later when he received a complete copy of the dealer agreement signed by Media Arts. This argument applies only to the Dahls' first dealer agreement because they concede the Standard Terms and Conditions were attached to their five subsequent dealer agreements at the time they were executed, and they were aware of the arbitration provisions in the subsequent agreements.[10] Kathy Young also disputes that the Standard Terms and Conditions were attached to the one dealer agreement she executed on behalf of KY Arts, although her testimony was not as unequivocal as Dahl's.[11] The Gallery Owners maintain this testimony raised a factual dispute on whether all their dealer agreements include an arbitration agreement, and the trial court acted within its discretion in resolving this factual dispute in their favor.[12] We disagree.

Regardless of the Gallery Owners' testimony, the dealer agreements explicitly state that the Standard Terms and Conditions are attached and that the dealer agreements consist in part of the Standard Terms and Conditions. The following statement appears on the first page of each dealer agreement immediately below the title:

> The following Media Arts Group, Inc. Dealer Agreement ("AGREEMENT") consists of the Signature Dealer Agreement ("Dealer Agreement"), Exhibit A which addresses Dealer's District ("Exhibit A") and the Standard Terms and Conditions *as attached hereto* and incorporated herein . . .

(Emphasis added).

Further, the entire dealer agreement consists of fourteen pages. There is a footer on each page noting its place in the sequential order "Page 1 of 14", "Page 2 of 14", etc. The Standard Terms and Conditions comprise pages 9 through 14. Therefore, it is abundantly clear to anyone reading the dealer agreement that it con-

---

9. The Dahl's first dealer agreement was one of the two agreements for Rockbrook Galleries, Inc.

10. Although the Gallery Owners concede they were aware of the arbitration provisions in their subsequent agreements, they contend they were fraudulently induced to agree to them. We will address this contention later as a defense to arbitration.

11. At first, Young testified she did not know whether the Standard Terms and Conditions were attached when she signed the dealer agreement because she did not have a copy in her records. However, when later asked again if the Standard Terms and Conditions was attached, she testified "not to my knowledge."

12. To counter this testimony, Media Arts presented the affidavit of a former officer, James Landrum, who testified Media Arts' policy was to send unsigned copies of the dealer agreements, including Exhibit A and the Standard Terms and Conditions, to dealers for signature. If a dealer returned an incomplete or unsigned agreement, Media Arts requested that the dealer return the rest of the agreement with all required signatures, or Media Arts sent another complete copy for signature. He signed the two Rockbrook Galleries agreements and the KY Arts agreement and would not have done so without ensuring the gallery owner had signed and returned the entire agreement.

sists in part of the Standard Terms and Conditions.[13]

 Under California law, the general rule is that when a person with the capacity of reading and understanding an instrument signs it, he is, in the absence of fraud and imposition, bound by its contents, and is estopped from saying that its provisions are contrary to his intentions or understanding. *See Jefferson v. Cal. Dept. of Youth Auth.*, 28 Cal.4th 299, 121 Cal. Rptr.2d 391, 48 P.3d 423, 425 (2002) (citing *Palmquist v. Mercer*, 43 Cal.2d 92, 272 P.2d 26 (1954)). Similarly, under Texas law, a person is obligated to protect himself by reading what he signs and, absent fraud, may not excuse himself from the consequences of failing to meet that obligation. *See First City Mortg. Co. v. Gillis*, 694 S.W.2d 144, 147 (Tex.App.-Houston [14th Dist.] 1985, writ ref'd n.r.e.) (citing *G-W-L, Inc. v. Robichaux*, 643 S.W.2d 392, 393 (Tex.1982), *overruled on other grounds, Melody Home Mfg. Co. v. Barnes*, 741 S.W.2d 349, 355 (Tex.1987)). In the absence of fraud, one who signs an agreement, without knowledge of its contents, is presumed, to have consented to its terms. *See id.*[14] Consequently, a party to a contract may not successfully claim that he believed the provisions of the contract were different from those plainly set out in the contract or that he did not understand the meaning of the language used. *See Amouri v. Southwest Toyota, Inc.*, 20 S.W.3d 165, 169 (Tex.App.-Texarkana 2000, pet. denied).

Because the dealer agreements explicitly state the Standard Terms and Conditions are attached, the Gallery Owners are estopped to deny that the Standard Terms and Conditions were actually attached to the dealer agreements at the time they signed them. Further, because the dealer agreements explicitly state they consist in part of the Standard Terms and Conditions, the Gallery Owners cannot now claim they were unaware the Standard Terms and Conditions were a part of the dealer agreements. Quite simply, the law charges the Gallery Owners with knowledge of their existence. Therefore, the Standard Terms and Conditions, including the arbitration provisions contained therein, are part of the first dealer agreement executed by the Dahls and the one dealer agreement executed by Young. Accordingly, we conclude that all the dealer agreements executed by the Gallery Owners include an arbitration agreement.

**C. Defenses to Enforcement of Arbitration Agreement**

Having found the existence of an arbitration agreement in all the dealer agreements, we consider the Gallery Owners' defenses to its enforcement.

**1. Waiver**

 The Gallery Owners contend that Media Arts waived enforcement of the arbitration agreements. They rely solely on Alvin Dahl's testimony regarding a statement made to him by a Media Arts employee. According to Dahl, he inquired about the arbitration provision when the first dealer agreement was returned to him signed by Media Arts. He initially testified as follows:

> Q. And the terms and conditions that were attached as part of that book were exactly the same terms and conditions that had been sent to you

---

**13.** In addition, the Standard Terms and Conditions are referred to in the body of the dealer agreement.

**14.** While the Dahls allege they were fraudulently induced to enter into the arbitration provisions in their five subsequent dealer agreements, they do not allege fraud as to this first dealer agreement.

back after you signed the initial one in March of 1999?

A. Yeah. Actually I questioned people on that arbitration clause in that one and was told, "It will never be used, so don't worry about it," at that time by the district manager.

However, Dahl later clarified his testimony and said he was not told the arbitration provision *would* never be used; instead, he was told it *had* never been used:

Q. Mr. Dahl, you said that somebody had told you that Media Arts Group doesn't enforce those arbitration agreements. Who told you that?

A. No, what I said basically was I called the district manager once we finally got that in. And in the process there was a new district manager coming in, and Randy basically said he would check on it. And he called me back; and he said, 'I checked on it, and nobody—they have never had to use it an arbitration agreement,' and just basically don't worry about it.[15]

▮▮▮ Under both California and Texas law, waiver is generally defined as the intentional relinquishment of a known right or conduct inconsistent with claiming that right. *See Platt Pacific, Inc. v. Andelson,* 6 Cal.4th 307, 24 Cal.Rptr.2d 597, 862 P.2d 158, 162 (1993); *Engalla v. Permanente Med. Group, Inc.,* 15 Cal.4th 951, 64 Cal.Rptr.2d 843, 938 P.2d 903, 923 (1997); *United States Fid. & Guar. Co. v.*

*Bimco Iron & Metal Corp.,* 464 S.W.2d 353, 357 (Tex.1971); *Oakwood,* 987 S.W.2d at 574. There is a strong presumption against waiver of arbitration, and any doubts should be resolved in favor of arbitration. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983).

The Gallery Owners have not shown that the statement allegedly made to Dahl constitutes waiver of Media Arts' right to arbitrate.[16] The statement that Media Arts has never had to use an arbitration agreement in the past does not amount to a representation it will not enforce an arbitration agreement against the Gallery Owners in the future. Further, it is unclear whether the employee said "don't worry about it," or this was Dahl's interpretation of their conversation. Regardless, even if the trial court concluded the Media Arts' employee said "don't worry about it," this statement is entirely too vague to be interpreted as an intentional relinquishment of Media Arts' right to arbitrate. Accordingly, Media Arts did not waive its right to arbitrate the Gallery Owners' claims.

**2. Fraudulent Inducement**

▮▮ The Gallery Owners also rely on this alleged statement to Dahl to prove fraudulent inducement.[17] They assert the statement fraudulently induced the Dahls to agree to the arbitration provision in their subsequent dealer agreements.[18]

---

15. Young did not testify regarding any such conversations with Media Arts or present any evidence to support waiver of the arbitration provision in the KY Arts dealer agreement.

16. Waiver commonly becomes an issue in the enforcement of arbitration agreements when a party has performed some act allegedly inconsistent with claiming the right to arbitrate, such as failing to timely initiate arbitration or participating in the legal process. *See,*

*e.g., Engalla,* 64 Cal.Rptr.2d 843, 938 P.2d at 923; *In re Bruce Terminix Co.,* 988 S.W.2d 702, 704 (Tex.1998). Here, the Gallery Owners rely on an express statement to prove waiver, so we will determine whether the statement was an intentional relinquishment of the right to arbitrate.

17. Again, Young has presented no evidence to support a fraudulent inducement defense.

■ Under both California and Texas law, a party claiming fraudulent inducement must prove (1) a material representation; (2) that was false; (3) knowledge of falsity; (4) intent to defraud, i.e. to induce reliance; (5) justifiable reliance; and (6) resulting damage. *See Lazar v. Superior Court*, 12 Cal.4th 631, 49 Cal.Rptr.2d 377, 909 P.2d 981, 984–85 (1996); *FirstMerit*, 52 S.W.3d at 758. Here, the Gallery Owners have not proved the most basis element of a fraudulent inducement claim—a material false representation. They do not assert that the statement that Media Arts has never to had to use an arbitration agreement was false. *See Oakwood*, 987 S.W.2d at 574 (seller's representation that home sale would not go through if buyers did not sign arbitration agreement did not prove buyers were fraudulently induced to sign arbitration agreement absent assertion that the statement was false). Again, the statement "don't worry about it," if made by Media Arts, is entirely too vague to constitute a material false representation that Media Arts would not enforce the arbitration agreements. *See FirstMerit*, 52 S.W.3d at 758 (refusing to invalidate arbitration provision based on fraud because there was no evidence the sellers actually misrepresented the terms of the provision); *Engalla*, 64 Cal.Rptr.2d 843,

938 P.2d at 919 (stating element of material misrepresentation is judged by whether a reasonable person would attach importance to its existence in determining choice of action in the transaction in question). Accordingly, the Gallery Owners have failed to prove their fraudulent inducement defense.

### 3. Unconscionability

■ Finally, the Gallery Owners assert the arbitration agreements are void because they are unconscionable. Under both California and Texas law, unconscionability includes two aspects: (1) procedural unconscionability, which focuses on the circumstances surrounding the adoption of the arbitration provision; and (2) substantive unconscionability, which focuses on the terms of the arbitration provision itself. *See Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 130 Cal.Rptr.2d 892, 63 P.3d 979, 983 (2003), *cert. denied*, —— U.S. ——, 124 S.Ct. 83 (2003) (NO. 02–1720); *Halliburton*, 80 S.W.3d at 571.

The Gallery Owners argue that the arbitration provisions are *per se* procedurally unconscionable because they are adhesion contracts imposed on them on a "take it or leave it" basis. They assert that Media Arts simply attached the Standard Terms and Conditions to the back of all dealer agreements, Media Arts had superior bar-

---

18. Media Arts argues that the the Gallery Owners cannot rely on this statement to avoid arbitration because their fraudulent inducement claim is not sufficiently focused on the negotiation and acceptance of the arbitration provision. We disagree. The Gallery Owners do not rely on this statement to avoid the subsequent dealer agreements in their entirety; instead, they assert the statement induced them to enter into the arbitration provisions in these subsequent dealer agreements. *See FirstMerit*, 52 S.W.3d at 756, 758 (fraudulent inducement defense must specifically relate to the arbitration provision itself, not the contract as a whole, to defeat arbitration). Me-

dia Arts further argues that this statement is inadmissible parol evidence because the Gallery Owners rely on it to vary the terms of the subsequent dealer agreements. Under Texas law, at least, we agree. Although extrinsic evidence, at times, has been held admissible to show whether a party was fraudulently induced to enter into a contract, any alleged reliance on oral representations contrary to the plain wording of the contract is now, as a matter of law, unreasonable. *See DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.*, 112 S.W.3d 854 (Tex.App.-Houston [14th Dist.] 2003, no pet. h.) (en banc).

gaining power, and there was no opportunity to negotiate. The Gallery Owners rely on Dahl's testimony that he was not in a position to negotiate the removal of the arbitration provisions because when he noticed the provision in his first dealer agreement, he had opened one gallery and was constructing another. Dahl also made a general statement that a dealer is never in a position to negotiate with Media Arts.

California law defines an "adhesion contract as a standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *See Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 99 Cal.Rptr.2d 745, 6 P.3d 669, 689 (2000). Similarly, Texas law defines an adhesion contract as a contract in which one party has absolutely no bargaining power or ability to change the contract terms. *See In re H.E. Butt Grocery Co.*, 17 S.W.3d 360, 370–71 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding). At best, Dahls testimony suggests the arbitration provisions *may* be adhesion contracts because the Gallery Owners had no opportunity to negotiate.[19]

However, an adhesion contact is not automatically unconscionable under California or Texas law. *See Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 690; *H.E. Butt*, 17 S.W.3d at 371. For an arbitration agreement to be found unconscionable under California law, it must be *both* procedurally and substantively unconscionable. *See Little*, 130 Cal.Rptr.2d 892, 63 P.3d at 983; *Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 690. Under Texas law, the party opposing arbitration must also present some other evidence of unconscionability. *See Oakwood*, 987 S.W.2d at 574; *H.E. Butt*, 17 S.W.3d at 371. The Gallery Owners have presented no other evidence that the arbitration provisions are unconscionable. *See Oakwood*, 987 S.W.2d at 573–74 (seller's statement that buyer had to sign arbitration agreement or it could not finance or take possession of home did not prove unconscionability).

In fact, the Gallery Owners do not argue, or provide any authority, that the arbitration provisions are substantively unconscionable.[20] In California, substantive unconscionability arises from overly harsh or one-sided contract terms. *See Little*, 130 Cal.Rptr.2d 892, 63 P.3d at 983–84; *Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 690. Texas applies a somewhat stricter standard to evaluate substantive

---

**19.** We question whether the arbitration provisions were adhesion contracts because an adhesion contract also has been defined "as a standardized contract form for *consumer* goods and services that are offered on a 'take it or leave it' basis without affording the consumer a realistic opportunity to bargain and under such conditions that the consumer cannot obtain the desired product or services except by acquiescing." *See H.E. Butt*, 17 S.W.3d at 371 n. 8 (emphasis added). The dealer agreements were business—not consumer—contracts. Although Young's gallery was her first business, Dahl had been a businessman for forty years. Further, although Dahl had opened or constructed two galleries when he allegedly first noticed the arbitration

provision, he signed dealer agreements containing the same provision for four more galleries.

**20.** The Texas Supreme Court recently held that a court may consider both procedural and substantive unconscionability in evaluating the validity of an arbitration provision whereas previously claims of procedural unconscionability were decided by the courts, but claims of substantive unconscionability were submitted to the arbitrators. *Halliburton*, 80 S.W.3d at 571–72 (abrogating *Oakwood* to the extent *Oakwood* required claims of substantive unconscionability be decided by the arbitrators).

unconscionability—focusing not only on one-sided terms, but whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the terms are so one-sided that they are unconscionable under the circumstances existing when the parties made the contract. *See FirstMerit*, 52 S.W.3d at 757.

There is nothing harsh or one-sided about this arbitration Gallery Owners to arbitrate any potential disputes. It gives both parties equal participation in choosing arbitrators. It provides for application of the rules of the American Arbitration Association. It does not give Media Arts any greater rights than the Gallery Owners and does not limit the Gallery Owners' ability to recover in arbitration. *Compare Halliburton*, 80 S.W.3d at 572 (finding arbitration program not substantively unconscionable because it allowed both parties to participate in selection of the neutral arbitrator, allowed pre-arbitration discovery under Federal Rules of Civil Procedure, preserved all remedies employee could have pursued in court system, allowed recovery of attorneys' fees, and provided fee for employee to consult with attorney) *with Armendariz*, 99 Cal.Rptr.2d 745, 6 P.3d at 694 (finding arbitration agreement substantively unconscionable because it required arbitration of employee's, but not employer's, claims, and limited employee's, but not employer's, potential damages).[21] Therefore, the Gallery Owners have failed to prove their unconscionability defense.

## V. CONCLUSION

Media Arts has established the existence of an arbitration agreement subject to the FAA, the arbitration agreement encompasses the claims at issue, and the Gallery Owners have failed to prove any defenses to its enforcement. Therefore, Media Arts has no adequate remedy by appeal from the trial court's refusal to compel arbitration, and mandamus relief is appropriate. Accordingly, we sustain Media Arts' three issues. We are confident the trial court will vacate its oral order of December 19, 2002 and its written order of January 31, 2003 (denying reconsideration), and will compel arbitration of the claims in the underlying suit and stay its own proceedings. If the trial court fails to do so, the writ will issue.

---

**21.** In *FirstMerit,* the Texas Supreme Court rejected *Armendariz* to the extent *Armendariz* requires mutuality of obligation in arbitration provisions because the principle is one of preventing oppression and unfair surprise, not of disturbing the allocation of risks because of superior bargaining power. *See* 52 S.W.3d at 757. Regardless, because the arbitration provisions here are not one-sided at all, they are not substantively unconscionable under the California standard or the stricter Texas standard.