TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00537-CV






Kendall Builders, Inc., Appellant


v.


Jane Chesson and Phillip J. Cullen, Appellees







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 261ST JUDICIAL DISTRICT

NO. GN-202292, HONORABLE CHARLES F. CAMPBELL, JR., JUDGE PRESIDING





O P I N I O N




 This appeal arises from a dispute between a married couple, appellees Jane Chesson
and Phillip J. Cullen, and a building contractor, appellant Kendall Builders, Inc. (Kendall), whom
appellees hired to remodel a home they had purchased in Austin. Before the remodeling was
completed, appellees became dissatisfied with Kendall's work and fired the contractor. Appellees
and Kendall asserted damage claims against each other, which were arbitrated and then litigated
before the district court. Our issues on appeal concern whether the district court erred in (1) setting
aside an arbitration award in favor of Kendall on the basis of evident partiality; (2) finding that
appellees' Austin property was homestead property exempt from liens Kendall had placed on it; and
(3) awarding attorney's fees. We affirm the judgment in part and reverse in part. 


BACKGROUND


The dispute

 Before moving to Austin, appellees lived in California with their five children. The
family sought to relocate to Austin after the company with which Cullen was employed was acquired
by Vignette Corporation and he was transferred to Austin. Appellees bought a house in Austin that
needed substantial remodeling to accommodate their family. Soon thereafter, appellees contracted
with an interior decorator. The interior decorator recommended Kendall to perform the renovation. 
On November 10, 2000, Chesson entered into a contract with Kendall whereby the contractor would
handle the remodeling.

 This contract had several features that bear upon our analysis of the issues. First, it
contained an arbitration clause, which the parties do not appear to dispute is governed by the Texas
Arbitration Act (1) rather than its federal counterpart. (2) Second, it is undisputed that the manner in
which the contract was executed did not satisfy the requirement for fixing liens on Texas homestead
property because, among other things, only Chesson, and not Cullen, signed the agreement. (3) 

 The family had claimed its California home as a homestead for seven years. During
the remodeling, Cullen moved to Austin, initially lived in an apartment away from the Austin
property, and then later moved into the garage apartment on the Austin property. Meanwhile,
Chesson and the couple's five children remained in California. However, even before entering into
the contract with Kendall, in addition to hiring the decorator, appellees registered to vote (and voted)
in Austin, obtained Texas driver's licenses, had their car shipped to Austin and registered in Texas,
opened a joint checking account in Austin for which they listed the Austin property as their home
address, and made donations to Austin charities.

 Several months into the remodeling, appellees became dissatisfied with Kendall's
work and terminated the contract. After the termination, Kendall claimed that its work had been
substantially completed and that appellees owed it $42,897.66 for labor and materials it furnished.
Appellees disputed this claim and asserted that it would take $90,000 to fix damage that Kendall had
caused. Kendall placed liens on appellees' Austin property to secure the amounts it claimed for
labor and materials. See Tex. Prop. Code Ann. § 53.254 (West Supp. 2004).


The arbitration

 Pursuant to the contract, the parties went to arbitration to resolve their dispute. The
parties agreed not to submit to the arbitrator any complaint relating to Kendall's liens. Under the
governing American Arbitration Association (AAA) rules, the parties selected a neutral arbitrator
from an AAA-approved list. The arbitrator held a hearing spanning three days. Approximately one
month later, the arbitrator awarded Kendall most of the sums it sought and nothing to appellees.

 Initially, as the parties prepared to go to arbitration, only Chesson and Kendall were
parties. This was consistent with the underlying contract, which had been signed by only Chesson
and not Cullen. Correspondence and information regarding the arbitration were sent only to
Chesson. This included a letter directly from the AAA notifying Chesson of the need to choose an
arbitrator and directing her to its website which outlined AAA rules and procedures for choosing the
arbitrator. Cullen was added as a party only later, but prior to the arbitration hearing.

 During a break in the arbitration, the arbitrator mentioned to Cullen that he had
purchased stock at seven or eight dollars a share from Vignette, Cullen's employer, and asked
whether the stock was "ever going to go up." At that time, Vignette's stock was trading for around
two dollars a share. (4) Neither Chesson nor the couple's lawyer was present. Cullen later recounted
the exchange to his wife "a couple of days later." Twenty-eight days after the exchange occurred,
the arbitrator issued the award.

 Only after the unfavorable award was issued did appellees mention to their lawyer
Cullen's exchange with the arbitrator. Appellees' lawyer deposed the arbitrator and discovered that
the arbitrator had lost over $5,000 due to a decrease in Vignette's stock price, approximately a 1%
decrease in the arbitrator's net worth. 


Trial court proceedings

 After their investigation concerning the arbitrator's interest in Vignette, appellees
filed an application to vacate the arbitration award alleging "evident partiality" of the arbitrator. 
Kendall counterclaimed seeking to confirm the award and foreclose on its liens on appellees'
property. Appellees responded with a motion to remove the liens, claiming that their Austin property
was their homestead as of the date that the liens were recorded. Because it is undisputed that
Kendall did not follow the procedures that would have enabled it to place liens on homestead
property, the issue of homestead status alone controlled the validity of the liens. Appellees also
sought attorney's fees.

 All claims were tried to the court. Two evidentiary issues arose during the bench
trial. First, in attempting to demonstrate evident partiality, appellees sought to introduce evidence
through Cullen that "[i]nvestors in general were very upset with Vignette" because of the company's
stock performance. Kendall objected on hearsay grounds. The trial court permitted the testimony
for the limited purpose of establishing "the effect upon Mr. Cullen." Second, after a dispute
regarding whether appellees could prove up attorney's fees through their counsel, appellees did not
present evidence on attorney's fees but instead urged the trial court to take judicial notice of a
reasonable sum.

 The district court vacated the arbitration award and awarded appellees attorney's fees
without specifying an amount. It also ruled that the Austin property was appellees' homestead as
of the time they entered the construction contract with Kendall and removed the liens. Kendall
requested findings of fact and conclusions of law, which the trial court entered. Among these, the
court found that the arbitrator's failure to disclose his stock losses in Vignette constituted "evident
partiality" requiring the court to vacate the award and that appellees did not waive their right to
object to the evident partiality of the arbitrator. The district court also found that $23,000 was a
reasonable amount for the attorney's fee award. Kendall requested additional findings of fact and
conclusions of law, and the trial court entered additional findings of fact but declined to enter
additional conclusions of law. (5) Kendall now appeals.


DISCUSSION


Standard of Review

 We attach to findings of fact the same weight, force, and dignity that we attach to a
jury's verdict upon jury questions. See Catalina v. Blasdel, 881 S.W.2d 295, 297 (Tex. 1994);
Lawyers Sur. Corp. v. Larson, 869 S.W.2d 649, 653 (Tex. App.--Austin 1994, writ denied). 
Findings of fact are reviewable for legal and factual sufficiency of the evidence by the same
standards used to review jury findings. Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835
S.W.2d 190, 195 (Tex. App.--Austin 1992, no writ).

 In deciding a legal sufficiency challenge, "we must view the evidence in a light that
tends to support the disputed finding and disregard evidence and inferences to the contrary." Wal-Mart Stores, Inc. v. Canchola, 121 S.W.3d 735, 739 (Tex. 2003) (citing Bradford v. Vento, 48
S.W.3d 749, 754 (Tex. 2001)). A legal sufficiency or "no evidence" point will be sustained when
(a) there is a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence conclusively
establishes the opposite of the vital fact. Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706,
711 (Tex. 1996); Robert W. Calvert, "No Evidence" and "Insufficient Evidence" Points of Error,
38 Tex. L. Rev. 361, 362-63 (1960). More than a scintilla of evidence exists when the evidence
supporting the finding, as a whole, "rises to a level that would enable reasonable and fair-minded
people to differ in their conclusions." Havner, 953 S.W.2d 706, 711 (quoting Burroughs Wellcome
Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995); Transportation Ins. Co. v. Moriel, 879 S.W.2d 10,
25 (Tex. 1994)). If the evidence is so weak as to do no more than create a mere surmise or suspicion
of its existence, its legal effect is that it is no evidence. Haynes & Boone v. Bowser Bouldin, Ltd.,
896 S.W.2d 179, 182 (Tex. 1995). 

 When reviewing a challenge to the factual sufficiency of the evidence, we must
consider, weigh, and examine all of the evidence in the record. Plas-Tex, Inc. v. U.S. Steel Corp.,
772 S.W.2d 442, 445 (Tex. 1989). If a party is attacking the factual sufficiency of an adverse finding
on an issue to which the other party had the burden of proof, the attacking party must demonstrate
that there is insufficient evidence to support the adverse finding. Westech Eng'g, 835 S.W.2d at 196. 
We should set aside the verdict only if the evidence that supports the jury finding is so weak as to
be clearly wrong and manifestly unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We
may not reverse merely because we conclude that the evidence preponderates toward a different
answer. See Herbert v. Herbert, 754 S.W.2d 141, 144 (Tex. 1988).

 A trial court's legal conclusions will be upheld on appeal if the judgment can be
sustained on any legal theory supported by the evidence. See Westech Eng'g, 835 S.W.2d at 196. 
Incorrect conclusions will not require a reversal if the controlling findings of fact will support a
correct legal theory. See id. Moreover, conclusions of law may not be reversed unless they are
erroneous as a matter of law. See id.


Arbitration issues

 Kendall asserts that the arbitrator was not evidently partial, (6) the testimony regarding
shareholder hostility was inadmissible hearsay, and that, in any event, appellees waived their
objection to the arbitrator's partiality. We agree that appellees waived their evident partiality
complaint and need not reach Kendall's other grounds.

 We initially note that Texas law favors the arbitration of disputes. See CVN Group,
Inc. v. Delgado, 95 S.W.3d 234, 252 (Tex. 2002); Brazoria County v. Knutson, 176 S.W.2d 740, 743
(Tex. 1943) ("Arbitration is a proceeding so favored by Texas law that both our Constitution and
statutes provide for the submission of differences to arbitration."). Arbitration is founded upon the
consent of parties to forego their right to litigate disputes in our court system and instead submit
them to a private decisionmaker. Texas law provides various protections to ensure that such consent
is meaningfully obtained. Thus, while Texas courts rigorously enforce valid arbitration agreements,
contractual defenses--such as fraud in the inception, mutual mistake, or unconscionability--can bar
the enforcement of an arbitration agreement. See In re Haliburton, 80 S.W.3d 566, 572 (Tex. 2002);
In re Oakwood Mobile Homes, Inc., 987 S.W.2d 571, 573 (Tex. 1999). Likewise, while trial courts
have limited powers to invalidate arbitration awards, the Texas Arbitration Act requires them to
vacate such an award if the rights of a party were prejudiced by "evident partiality by an arbitrator
appointed as a neutral arbitrator." Tex. Civ. Prac. & Rem. Code Ann. § 171.088(2)(A) (West Supp.
2004). And where, as here, the parties are given the right to choose a neutral arbitrator to decide
their dispute, the failure of a prospective arbitrator to provide parties with information bearing upon
his or her partiality may itself constitute evident partiality. As the Texas Supreme Court has held:


[A] prospective neutral arbitrator selected by the parties or their representatives
exhibits evident partiality if he or she does not disclose facts which might, to an
objective observer, create a reasonable impression of the arbitrator's partiality. We
emphasize that this evident partiality is established from the nondisclosure itself,
regardless of whether the nondisclosed information necessarily establishes partiality
or bias.



Burlington N. R. R. Co. v. TUCO Inc., 960 S.W.2d 629, 636 (Tex. 1997) (emphasis in original)
(citing Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 147 (1968)). The
Texas Supreme Court also noted that full disclosure of such facts also serves the salutary goal of
"allow[ing] the parties to evaluate any potential bias at the outset, rather than shifting the burden
to the courts to do so when a dissatisfied party challenges an award." Id. (citing Commonwealth
Coatings, 393 U.S. at 151). (7)

 Implicit in TUCO's full disclosure principle, as well as in the broader concept of
arbitration as a consensual dispute resolution process, is that parties can agree to arbitrate a dispute,
or continue arbitrating a dispute, despite the revelation of facts suggesting possible bias or partiality
by the arbitrator. (8) Id. at 637. In fact, as the supreme court suggested, capable arbitrators chosen on
the basis of expertise and experience in a given industry will often have had some prior dealings with
the parties that might be perceived as presenting a risk of partiality. Id. at 635. Rather than
mandating a per se rule of disqualification in such situations, parties who have the right to choose
arbitrators are instead allowed to use their own judgment to balance the competing interest of
avoiding a risk of partiality with the interest in obtaining the arbitrator's expertise or other benefits
of proceeding before the arbitrator. Id.

 Consistent with these principles, a party can waive an otherwise valid objection to
the partiality of the arbitrator by proceeding with arbitration despite knowledge of facts giving rise
to such an objection. This is true even where an evident partiality objection could be asserted based
on failure to disclose. Mariner Fin. Group, Inc. v. H.G. Bossley, 79 S.W.3d 30, 36 (Tex. 2002)
(Owen, J., concurring) ("[t]here could be waiver of evident partiality based on nondisclosure if the
complaining party knew all the facts before the arbitration concluded and did not complain").

 Waiver is "[the] intentional relinquishment of a known right or intentional conduct
inconsistent with claiming it." In re Media Arts Group, Inc., 116 S.W.3d 900, 909 (Tex.
App.--Houston [14th Dist.] 2003, no pet.). Here, it is undisputed that both Cullen and Chesson had
actual knowledge that the arbitrator suffered investment losses in Vignette stock--the basis for their
evident partiality complaint--approximately one month before the arbitration award was issued. The
arbitrator divulged this information directly to Cullen during the arbitration hearings. "[A] couple
of days later," as he put it, Cullen informed Chesson of this disclosure. Appellees nonetheless
proceeded with the arbitration without objection, awaiting the award that was eventually issued. 
Only after the award turned out to be adverse to them did either Cullen or Chesson raise an objection
regarding the arbitrator's partiality or even bother to raise the issue with their attorney.

 To minimize the significance of their knowledge of the arbitrator's stock losses,
appellees rely on three contentions. First, they urge that the arbitrator did not divulge sufficient
information for appellees to have knowingly and intentionally relinquished anything. We disagree
because the information divulged by the arbitrator was sufficient to place them on notice of the facts
giving rise to what they now contend is a reasonable possibility of partiality. See Cook Indus. v. C.
Itoh & Co., 449 F.2d 106, 108 (2nd Cir. 1971) ("When a party has knowledge of facts possibly
indicating bias or partiality on the part of the arbitrator he cannot remain silent and later object to
the award of the arbitrator on that ground.") (emphasis added). In fact, disclosure of further details
regarding the arbitrator's losses in Vignette--which appellees later discovered constituted less than
one percent of the arbitrator's net worth--would actually have tended to minimize the perceived
significance of the losses. Before appellees researched the extent of the arbitrator's losses in
Vignette, all that was known was the more ominous spectre that the arbitrator had lost some
unspecified amount. 

 Second, appellees emphasize that the arbitrator mentioned his stock losses only to
Cullen, who was not familiar with the AAA rules. The district court found that "Cullen did not
and--because he was not familiar with the AAA Rules and procedures to be followed in Arbitration
Proceedings--could not understand and appreciate the significance of the Arbitrator's comments." 
However, it is undisputed that Cullen recounted his exchange with the arbitrator to Chesson shortly
after the hearing. Chesson undisputably received communications directly from the AAA informing
her where to find the AAA rules; she also participated in the selection of the arbitrator. For this
reason, we conclude that Chesson had at least constructive notice of her rights. We cannot reward
parties for not reading legal documents that affect them and then using their ignorance as a tool to
undermine the proceedings. (9) 

 Third, appellees emphasize that their lawyer did not know about the exchange
between Cullen and the arbitrator until after the award was announced. We reject appellees'
suggestion that their lawyer's lack of knowledge of grounds for an evident partiality objection
excuses conduct otherwise constituting waiver of that objection. Although no Texas cases appear
to have addressed appellees' precise contention, (10) Texas cases addressing evident partiality and
waiver issues contemplate disclosure of relevant facts to a party, with no mention of lawyers. See,
e.g., Bossley, 79 S.W.3d at 32 ("from the summary judgment evidence, we know that the Bossleys
did not learn about the relationship between Asmar and Nettles until after the arbitration"); TUCO,
960 S.W.2d at 635-39. As our sister court in Houston stated:


A party who does not object to the selection of the arbitrator or to any alleged bias
on the part of the arbitrator at the time of the hearing waives the right to complain. 
A party may not sit idly by during an arbitration procedure and then collaterally
attack that procedure on grounds not raised before the arbitrator when the result turns
out to be adverse. Implicit in this rule, however, is the idea that a party knows or has
reason to know of an arbitrator's bias but remains silent pending the outcome of the
arbitration.



Mariner Fin. Group, Inc. v. H.G. Bossley, 11 S.W.3d 349, 351-52 (Tex. App.--Houston [1st Dist.]
2000), aff'd, 79 S.W.3d 30, 32 (Tex. 2002) (internal citations omitted) (emphasis added); see also
TUCO, 960 S.W.2d at 637 n.9 ("Of course, a party who learns of a conflict before the arbitrator
issues his or her decision must promptly object to avoid waiving the complaint."). This appears to
be the rule in other jurisdictions, as well. (11)

 This focus on disclosure to parties, as opposed to their lawyers, is consistent with
TUCO's vision of arbitration as a procedure whereby parties must evaluate for themselves whether
to proceed with submitting their dispute before a particular decisionmaker. Having elected to
proceed with arbitration in the face of their knowledge of the arbitrator's losses in Vignette stock,
appellees cannot now complain of the outcome. See TUCO, 960 S.W.2d at 635-36 (expressing
preference for "allow[ing] the parties to evaluate any potential bias at the outset, rather than shifting
the burden to the courts to do so when a dissatisfied party challenges an award") (citing
Commonwealth Coatings, 393 U.S. at 151). We overrule the district court's vacation of the
arbitrator's decision and sustain Kendall's first issue.


Homestead issues

 Kendall's second issue challenges the district court's ruling that appellees' Austin
property was their homestead so as to invalidate Kendall's liens. We begin our discussion of this
issue by noting that the Texas Constitution provides special and unique protections for the
homestead, separate and distinct from the protections given other types of property. Tex. Const. art.
XVI, § 50. The homestead interest is a legal interest created by the constitution that provides
prophylactic protection from all but the few specifically enumerated types of constitutionally
permitted liens against homesteads. Heggen v. Pemelton, 836 S.W.2d 145, 148 (Tex. 1992). 
Constitutional homestead rights protect citizens from losing their homes; accordingly, statutes
relating to homestead rights are to be liberally construed to protect the homestead. Rooms With a
View, Inc. v. Private Nat'l Mortgage Ass'n, Inc., 7 S.W.3d 840, 849 (Tex. App.--Austin 1999, pet.
denied). Homestead rights have historically enjoyed great protection in our jurisprudence. Mills v.
Von Boskirk, 32 Tex. 360, 362 (1869).

 Homesteads are generally protected from forced sale for the payment of debts, except
for those debts specifically enumerated in the constitution, which include debts incurred for purchase
money on the homestead, for taxes owed thereon, and for work or services performed thereon. Tex.
Const. art. XVI, § 50(a)(1), (2), (5). Because the homestead protection does not extend to debts
incurred for improvements made to the homestead, laborers may secure valid mechanic's and
materialman's liens against the homestead on which the work was performed, but only by following
certain constitutional and statutory procedures. Id. § 50(a)(5); Tex. Prop. Code Ann. § 53.254 (West
Supp. 2004). Contractors like Kendall making improvements on a homestead must comply with the
requirements found in section 53.254 of the property code in order to attach a valid lien. Tex. Prop.
Code Ann. § 53.254. Only upon satisfaction of those requirements may a contractor attempt to force
the sale of a homestead by judicial foreclosure. Id. § 53.154 (West 1995). (12)

 It is undisputed that Kendall did not follow those procedures here. Instead, Kendall
contends that its liens were valid because appellees' Austin property was not homestead property. 
Kendall has stipulated that appellees intended to use the Austin property as their homestead once the
remodeling was completed. However, Kendall maintains that at the time appellees entered into the
construction contract with Kendall--the time that controls the validity of its liens--the Austin
property was not yet appellees' legal homestead because, as a matter of law, they had not abandoned
their California property.

 A family is not entitled to two homesteads at the same time. Tex. Const., art. XVI,
§ 51; Achilles v. Willis, 16 S.W. 746 (Tex. 1891). As the district court recognized in its conclusions
of law, "Texas has long recognized that the acquisition of a new homestead is an abandonment of
the old homestead as a matter of law." Id. (citing Silvers v. Welch, 91 S.W.2d 686, 687-88 (Tex.
1936)) (emphasis in original). In the Silvers case, the Texas Supreme Court faced a similar factual
and procedural situation as we do in this case. The Silvers had lived and farmed on one tract of
land--their homestead--for many years, but then they bought another tract of land and moved onto
it. Silvers, 91 S.W.2d at 686-87. They did not sell the first tract of land and some of their children
and some of their property remained there. Id. at 687. The court was called upon to determine
whether the lower courts had erred in deciding which of two properties was a homestead. The court
concluded: 


When the Silvers established their new homestead, they abandoned the old one as a
matter of law. It is well recognized that abandonment is largely a question of
intention, and that the mere fact of acquiring and moving upon another piece of
property does not conclude the question of abandonment; but here we have a finding
of the establishment of a homestead on the newly acquired tract. That finding is a
definite and conclusive determination that the first homestead was abandoned.



Id. at 687-88. 

 Thus, the controlling issue is not whether appellees undertook a series of acts to
formally abandon their California homestead, but only whether the evidence is legally and factually
sufficient to support the district court's finding that the Austin property had become appellees'
homestead by the time they entered into the construction contract with Kendall. See Norman v. First
Bank & Trust, Bryan, 557 S.W.2d 797, 802 (Tex. Civ. App.--Houston [1st Dist.] 1977, writ ref'd
n.r.e) (citing Silvers, 91 S.W.2d at 686). We conclude that the evidence is legally and factually
sufficient to support that finding.

 "Absent actual occupancy or intent to occupy coupled with overt acts of preparation
evidencing that intention, no homestead right attaches." Silvers, 91 S.W.2d at 688. It is essential
that there be an existing bona fide intention to dedicate the property as a homestead, and the intent
must be accompanied by such acts of preparation and such prompt subsequent occupation as will
amount to notice of the dedication. Simank v. Alford, 441 S.W.2d 234, 237 (Tex. App.--Austin
1969, writ ref'd n.r.e) (citing Gardner v. Douglass, 64 Tex. 76 (1885)). Here, before hiring Kendall,
appellees hired an interior decorator to assist in preparing the home for appellees' family to occupy. 
Furthermore, appellees also offered evidence that they registered to vote (and voted) in Austin,
obtained Texas driver's licenses, had their car shipped to Austin and registered it in Texas, opened
a joint checking account in Austin for which they listed the Austin property as their home address,
and made donations to Austin charities. Kendall does not dispute that such acts provide sufficient
indicia of the requisite intent to establish appellees' Austin property as their homestead.

 Furthermore, the Texas Supreme Court has suggested that fewer acts of preparation
may be necessary to establish a homestead where, as here, there is evidence that the contractor had
actual knowledge of a property owner's intent to use the property as a homestead. In Cameron v.
Gebhard, the supreme court stated that "[p]reparation--that is, such acts as manifest this
intention--is but the corroborating witness to the declaration of intention, the safeguards against
fraud, and an assurance of the bona fides of the declared intention of the party." 22 S.W. 1033, 1033
(Tex. 1893). In Cameron, the plaintiff lumber company had been expressly told by the property
owner that she intended to use the property as her homestead. Id. at 1033. The court held that proof
only that she had hired a contractor to build a house and told the lumber company that the property
owner intended to use the home as her homestead was enough to establish the property as her
homestead. Id.

 In the present case, Chesson and the interior decorator, who had recommended
Kendall for the remodeling work, both testified that Chesson informed Kendall, before they entered
into the remodeling contract, that the Austin property was to be the permanent home of Chesson, her
husband, and their family. Although a representative from Kendall testified that this information was
not relayed to Kendall, ultimately it is the purview of the trial court to make credibility
determinations between conflicting witnesses. See Raymond v. Rahme & Williams Invs., 78 S.W.3d
552, 555-56 (Tex. App.--Austin 2002, no pet.).

 In conducting a legal sufficiency review, we must determine whether more than a
scintilla of evidence exists supporting the trial court's finding thus that, as a whole, the evidence
"rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." 
Havner, 953 S.W.2d at 711. Under a factual sufficiency review, we should set aside the verdict only
if the evidence that supports the finding is so weak as to be clearly wrong and manifestly unjust. See
Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). We find the evidence legally and factually
sufficient to support the trial court's judgment. We overrule Kendall's second issue.


Attorney's fees

 Kendall asserts in its third issue that the district court erred in awarding appellees
attorney's fees because there is no evidence to support such an award. We agree. Appellees did not
introduce evidence of their attorney's fees, but merely asked the district court to take judicial notice
of the reasonableness and necessity of attorney's fees. On this basis alone, the district court made
a finding of fact that $23,000 was a reasonable amount for appellees' attorney's fees.

 A court may take judicial notice of usual and customary attorney's fees by statute in
certain specific instances. See Tex. Prac. & Rem Code Ann. § 38.004 (West 1997). However, it has
been expressly held that this provision only applies to actions seeking an award of statutory
attorney's fees pursuant to that chapter. Coward v. Gateway Nat'l Bank of Beaumont, 525 S.W.2d
857, 858-59 (Tex. 1975) (applying predecessor to chapter 38). Neither party asserts that this case
falls within any of the enumerated categories of chapter 38. Because there is no evidence in the
record to support the district court's attorney's fee award, we sustain Kendall's third issue and
reverse the award of attorney's fees.


CONCLUSION


 We hold that the district court erred in vacating the arbitration award; therefore, we
reverse that part of the district court's judgment and render judgment that the arbitration award be
reinstated. We affirm the district court's ruling invalidating Kendall's liens because appellees'
Austin home was their homestead. We reverse the district court's ruling awarding attorney's fees
to appellees.



 

 Bob Pemberton, Justice

Before Justices Kidd, B. A. Smith and Pemberton

Affirmed in Part; Reversed and Rendered in Part

Filed: June 24, 2004

1. Tex. Civ. Prac. & Rem. Code Ann. § 171.001-171.098 (West 1997 & Supp. 2004).
2. Federal Arbitration Act, 9 U.S.C.A. §§ 1, 2 (West 1999).
3. See infra n. 12.
4. Cullen had previously testified he worked for Vignette.
5. Kendall does not complain of the trial court's refusal to enter additional conclusions.
6. Subsumed in this ground, Kendall urges that evident partiality is a question of law, not fact,
and should be reviewed de novo. 
7. While acknowledging that a neutral arbitrator need not disclose relationships or
connections that are "trivial," the supreme court admonished that "conscientious arbitrators should
err in favor of disclosure." Burlington N. R. R. Co. v. TUCO Inc., 960 S.W.2d 629, 637 (Tex. 1997).
8. The TUCO court contemplated that such facts might come to light during the arbitration. 
Id. 
9. Cf. Estes v. Republic Nat'l Bank, 462 S.W.2d 273, 276 (Tex. 1970) (absent fraud, failure
to read contract generally is not ground to avoid it). 
10. Appellees point to a case from our sister court in Corpus Christi to support their contention
that their lawyer had to have knowledge of the potential bias in order for them to have properly
waived the objection. See Morin v. Boecker, 122 S.W.3d 911 (Tex. App.--Corpus Christi 2003, no
pet.). This case is distinguishable. In Morin, the party had received a document from the court
notifying him of court costs that had to be paid in order to perfect his appeal. Id. The court costs
were never paid and his appeal was dismissed. Id. The Corpus Christi court held, however, "that
when a party is represented by counsel who has made an appearance, Rules 8 and 21a require that
all communications be sent to the party's attorney." Id. at 914. The holding of Morin is based in
part on the fact that it was reasonable for the party to assume that the court had sent a copy of the
notice to his lawyer: "Most likely, a party will not understand the importance of getting the
information to his attorney promptly or will expect that his attorney received notice directly." Id. 
Here, under the facts of our case, the only way that their lawyer could have known about the
arbitrator's potential bias is for Cullen or Chesson to have informed him. Once appellees knew
about the potential bias it became their burden to object or risk waiving their objection.
11. See Daichi Hawaii Real Estate Corp. v. Lichter, 82 P.2d 411, 431-32 (Haw. 2003) (court
found waiver of evident partiality objection because party had letter in its files prior to arbitration
evidencing arbitrator's past dealings with opposing party); Kubarych v. Siegel, 595 N.Y.S.2d 293,
294 (N.Y. Sup. Ct. 1993) (party waived evident partiality objection when he did not object after
arbitrator coerced sports tickets from him); Jean A. McCoy & Sons, Inc. v. La Salle County, 363
N.E.2d 442, 443 (Ill. App. 1977) (party waived evident partiality objection when officer of party
discovered arbitrator having drinks with opposing party's representative but did not object until after
unfavorable award).
12. To fix a lien on a homestead, the property code requires that (1) the person who is to
furnish material or perform labor and the owner must execute a written contract setting forth the
terms of the agreement; (2) the contract must be executed prior to the furnishing of materials or the
performance of labor; (3) if the owner is married, the contract must be signed by both spouses; (4)
if the contract is made by an original contractor, the contract must inure to the benefit of all persons
who perform labor or furnish materials for the original contractor; and (5) the contract must be filed
with the county clerk of the county in which the homestead is located. Tex. Prop. Code Ann.
§ 53.254 (West Supp. 2004). The Texas Constitution also has requirements for attaching a lien on
a homestead; however, as for the requirements pertinent to this case, the property code includes the
constitution's requirements. See Tex. Const. art. XVI, § 50 ("in writing, with the consent of both
spouses, in the case of a family homestead, given in the same manner as is required in making a sale
and conveyance of the homestead").