TMI, INC., d/b/a Trendmaker
Homes, Appellant,

v.

John A. BROOKS, Kimberly M. Brooks, Miklyn M. Provenzano, Aston B. Griffiths, Bernice M. Griffiths, Daniel L. Woodard, Cinda J. Woodard, Carsten Alsguth, Sheri L. Alsguth, Timothy S. Hart and Marian Hart, Tanner Garth, Terri Garth, Raoul Leblanc, Debbie Leblanc, George Safi, Jill Safi, Jerry Thomas, and Nancy Thomas, Appellees.

In re TMI, Inc., d/b/a Trendmaker
Homes, Relator.

Nos. 14–05–00604–CV, 14–05–00878–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

May 10, 2007.

Jeff Nobles, Henry S. Platts, Jr., Brendan D. Cook, Liquita Lewis Thompson, Mary Madeleine Ryan, Houston, for appellant.

Alice Oliver–Parrott, Andrew Sher, Charles A. Botschen, Maria Teresa Arguidegui, Houston, Randal Lynn Telford, Irving, for Appellees.

## SUBSTITUTE OPINION

JOHN S. ANDERSON, Justice.

We withdraw our opinions issued January 9, 2007, issue the following opinion in

their place, and overrule appellees' motion for rehearing.

This is a consolidated interlocutory appeal and petition for writ of mandamus challenging the trial court's May 13, 2005 order denying a motion to compel arbitration filed by appellant, homebuilder TMI, Inc., d/b/a Trendmaker Homes ("Trendmaker"). *See* TEX. CIV. PRAC. & REM.CODE ANN. § 171.098(a) (Vernon 2005); 9 U.S.C. § 16. The lawsuit arose when appellees, nineteen homeowners in the Woodwind Lakes subdivision of Houston, learned their homesites were developed on or around property where there had been prior oil and gas activity. Alleging their homesites had been environmentally contaminated, the homeowners sued Trendmaker and other entities for failing to disclose the former presence of oil and gas operations on the property.[1] Trendmaker moved to compel arbitration pursuant to an arbitration provision in the purchase agreements signed by the homeowners. Concluding the arbitration provision was procedurally and substantively unconscionable, the trial court denied Trendmaker's motion.

In five points of error, Trendmaker asserts the trial court erred in (1) "drawing all factual inferences against arbitrability and ignoring normal presumptions and public policy" favoring arbitration; (2) finding the arbitration clause in the purchase agreements was procedurally unconscionable; (3) finding the arbitration clause was substantively unconscionable; (4) considering claims of fraudulent inducement rather than submitting them to an arbitrator; and (5) "creating a new standard for enforceability of arbitration agreements that would essentially require discovery to be taken in connection with a motion to compel arbitration." Because we determine the homeowners' claims fall within the scope of the arbitration agreement and they have not established their unconscionability defense, we reverse the trial court's May 13, 2005 order. We remand this case for further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

Trendmaker is in the business of building and selling homes. The appellees, John A. Brooks, Kimberly M. Brooks, Miklyn M. Provenzano, Aston B. Griffiths, Bernice M. Griffiths, Daniel L. Woodard, Cinda J. Woodard, Carsten Alsguth, Sheri L. Alsguth, Timothy S. Hart and Marian Hart, Tanner Garth, Terri Garth, Raoul LeBlanc, Debbie LeBlanc, George Safi, Jill Safi, Jerry Thomas, and Nancy Thomas (collectively, the "homeowners"), purchased new homes in Woodwind Lakes from Trendmaker. Each appellee or set of husband/wife homeowners signed an agreement (the "purchase agreement") with Trendmaker for the construction of a new house, ranging in value from $170,000 to $220,000. The purchase agreement contained the following arbitration provision:

All claims, disputes and other matters in question between Seller and Purchaser

---

1. The plaintiffs sued Woodwind Lakes Partnership # 3 Ltd., Woodwind Lakes Partnership, Lakeland Development Company, Mapani, Inc., Kentner P. Shell, Chicago Title Insurance Company, Centennial Homes, Inc., d/b/a Trendmaker Homes, TMI, Inc., Windham Holdings, L.P., 422S, Limited Liability Company, Aderus Company, Mapani Homes, Actington Company, and Actington of Texas Corporation (collectively, the "developer de-fendants") and Chevron USA, Inc. d/b/a ChevronTexaco Corporation and Amerada Hess Corporation (collectively, the "petroleum defendants"). The additional defendants are not material to Trendmaker's motion to compel arbitration or this appeal. The status of these additional defendants and plaintiffs' suit against them is not found in the appellate record.

arising out of or relating to this agreement or to any alleged defects relating to the Property including, but not limited to, any claims brought under the Texas Deceptive Trade Practices Act or the Residential Construction Liability Act, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association promulgated by the American Arbitration Association, as in effect [on] the date of any demand for arbitration hereunder, except that at Seller's sole option, it shall have all defenses based upon the applicable statute of limitations determined by a court of law or at any arbitrator's preliminary hearing. The foregoing agreement to arbitrate shall be enforceable under the prevailing Texas arbitration law. The award rendered by the arbitrator shall be final and binding upon the parties.

The words "defect" and "Property" are not defined in the purchase agreement.

After purchasing their homes, the homeowners discovered part of the property comprising Woodwind Lakes had been the former site of oil and gas operations. Until the 1970s, ChevronTexaco and Amerada Hess Corporation conducted oil and gas exploration and processing on the property. These operations involved a gas compression station, storage tanks, spill containment facilities, and disposal pits for oil and products derived from oil and natural gas. When the oil and gas operations concluded, the property was sold. Ultimately, Woodwind Lakes Partners # 3, Ltd., purchased the property to develop it as a housing subdivision.

During the development process, Lakeland Development Company ("Lakeland"), the project manager, discovered portions of the property were contaminated from the oil and gas operations. Lakeland began moving the contaminated soil to the platted recreational areas for remediation. Over time, some of the soil was apparently moved back into the residential lots. The homeowners became aware of the potential contamination at various times in 2003, when defendant ChevronTexaco issued letters to some of the homeowners requesting permission to conduct research concerning the environmental conditions in the neighborhood and on individual lots. Such testing revealed the presence of mercury, benzene, and other contaminants on individual lots and in common areas.

Various groups of homeowners brought suits against the developer, the builder, and the petroleum companies.[2] In the case at bar, homeowners Brooks, Provenzano, Griffiths, Woodard, Alsguth, and Hart[3] (the "original plaintiffs") brought suit against Trendmaker in the 234th District Court, alleging negligence, various forms of fraud, violations of the Deceptive Trade Practices Act, negligent misrepresentation, nuisance, and civil conspiracy, and seeking damages of more than one million dollars per home.[4]

2. Prior to this suit, another group of homeowners litigated the arbitrability of substantially the same contamination issues, pursuant to the same purchase agreement with Trendmaker, in cause No. 2002–55598, *Bernie Milligan, Hank Williams, and Brian and Donna Kibler v. Centennial Homes, Inc., d/b/a Trendmaker Homes*, in the 281st District Court of Harris County (the "Milligan case"). The parties consisted of five claimants who purchased three homes from Trendmaker. The Milligan case was referred to arbitration.

3. We refer to husband and wife claimants collectively by last name.

4. This damages estimate is based on a statement by the homeowners' counsel at the May 13, 2005 hearing and from Trendmaker's reply brief in this court; the homeowners did not allege a specific damages amount in their petitions.

Trendmaker answered, alleging *inter alia,* that the plaintiffs were barred from bringing the action because they had agreed to binding arbitration provisions in the purchase agreements for the homes. Trendmaker then filed a motion to compel arbitration, and on June 28, 2004, Judge Bruce D. Oakley granted the motion, ordering arbitration proceedings "consistent with the terms and conditions of the Purchase Agreements ... or as otherwise agreed upon by the parties." Homeowners Garth, LeBlanc, Safi, and Thomas intervened, and Trendmaker filed motions to compel arbitration as to the intervenors.

Subsequently, the original plaintiffs filed a motion to reconsider the order compelling arbitration. On November 8, 2004, after a hearing, Judge Oakley stated that he was "inclin[ed] to deny the motion for reconsideration and to grant the motion for arbitration," but no written order appears in the record. The parties agree Judge Oakley retired from the bench without ruling on the motion to reconsider. Judge Oakley's successor was recused, and the case was assigned to Judge Tony Lindsay of the 280th District Court.

On May 13, 2005, after hearing argument from both parties, Judge Lindsay found that, although the scope of the arbitration clause covered the claims that form the basis of this suit, the clause was both procedurally and substantively unconscionable. Judge Lindsay (1) granted the homeowners' motion to reconsider the prior order compelling arbitration and withdrew the order compelling arbitration as to the original plaintiffs, (2) denied Trendmaker's motion to compel arbitration, (3) stayed discovery and pretrial matters pending this appeal, and (4) allowed the homeowners to file motions to sever. Seeking relief from this order, Trendmaker filed this interlocutory appeal and petition for writ of mandamus.

## DISCUSSION

### A. *Standard of Review*

 The parties agree the Texas General Arbitration Act (the "TGAA") governs this dispute.[5] When an arbitration provision is governed by the TGAA, interlocutory appeal is the appropriate mechanism to challenge a denial of arbitration.[6]

---

**5.** *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 171.001–.098 (Vernon 2005). The parties agreed by signing the purchase agreements containing the arbitration agreement that such agreement to arbitrate "shall be enforceable under the prevailing Texas arbitration law."

**6.** In contrast, when an arbitration provision is governed by the Federal Arbitration Act (the "FAA"), a petition for writ of mandamus is the proper mechanism to challenge a denial of arbitration. *See In re Halliburton Co.,* 80 S.W.3d 566, 567 (Tex.2002); *Am. Med. Techs., Inc. v. Miller,* 149 S.W.3d 265, 269 (Tex.App.-Houston [14th Dist.] 2004, no pet). Trendmaker has alternatively filed a petition for writ of mandamus in the event the FAA is held to be the governing statute.

When the FAA applies to a specific contract, it preempts the TGAA and governs the agreement unless the parties specifically ex-

cluded its application in the contract. *Am. Med. Techs., Inc.,* 149 S.W.3d at 269. Here, the arbitration provision in the purchase agreement does not exclude application of the FAA. However, the FAA applies to all suits in state or federal court when the dispute concerns a "contract evidencing a transaction involving commerce." *Jack B. Anglin Co. v. Tipps,* 842 S.W.2d 266, 269–70 & n. 6 (Tex. 1992) (citing *Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 2525, 96 L.Ed.2d 426 (1987)); *Am. Med. Techs., Inc.,* 149 S.W.3d at 269. A contract evidences interstate commerce if it affects interstate commerce. *Am. Med. Techs., Inc.,* 149 S.W.3d at 269; *In re Educ. Mgmt. Corp.,* 14 S.W.3d 418, 423–24 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding). When, as here, an agreement is silent as to whether the FAA applies, the question of whether the transaction affects interstate commerce is one of fact. *See In re Educ. Mgmt. Corp.,* 14 S.W.3d at 422.

Tex. Civ. Prac. & Rem.Code Ann. § 171.098(a)(1) (Vernon 2005); *see Am. Med. Techs., Inc. v. Miller*, 149 S.W.3d 265, 269 (Tex.App.-Houston [14th Dist.] 2004, no pet). Thus, we review the trial court's order via the interlocutory appeal and deny the petition for writ of mandamus.

When reviewing by interlocutory appeal an order denying arbitration under the TGAA, we apply a *de novo* standard to legal determinations and a "no evidence" standard to factual determinations. *Dewey v. Wegner*, 138 S.W.3d 591, 597 (Tex.App.-Houston [14th Dist.] 2004, no pet.). Under the "no evidence" standard, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex.2005). We must credit favorable evidence and disregard contrary evidence only if a reasonable factfinder could do so. *Id.*

### B. Scope of the Arbitration Provision

Under the TGAA, a party seeking to compel arbitration must establish (1) the existence of a valid, enforceable arbitration agreement and (2) that the claims asserted fall within the scope of that agreement. *Valero Energy Corp. v.*

*Teco Pipeline Co.*, 2 S.W.3d 576, 581 (Tex. App.-Houston [14th Dist.] 1999, no pet.). Because state and federal policies favor arbitration, a presumption exists favoring agreements to arbitrate, and courts must resolve any doubts about an arbitration agreement's scope in favor of arbitration. *Cf. In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 753 (Tex.2001) (discussing arbitration under the FAA).

Here, the trial court determined the arbitration provision encompassed the homeowners' claims. We agree. By its terms, the provision applies to "[a]ll claims, disputes and other matters in question between Seller and Purchaser arising out of or relating to this agreement or to any alleged defects relating to the Property." Although the word "Property" is not specifically defined in the purchase agreement, the agreement states the purchaser is buying "the following *parcel of land,* including all improvements as provided herein." (Emphasis added). There is no language in the purchase agreement implying the term "Property" is limited to the improvements.[7] Moreover, any doubts regarding the scope of the arbitration provision must be resolved in favor of arbitration. *Id.* Thus, the trial court properly determined Trendmaker met its burden to establish (1) the existence of an arbitration agreement and (2) that the claims asserted

Interstate commerce is evidenced by, *inter alia,* location of headquarters in another state, manufacture of components in a different state, transportation of goods across state lines, and billings prepared in another state. *Stewart Title Guar. Co. v. Mack*, 945 S.W.2d 330, 333 (Tex.App.-Houston [1st Dist.] 1997, writ dism'd w.o.j.). Here, it is undisputed Trendmaker is a Texas corporation selling real property located within Texas via purchase agreements executed solely in Texas. The only evidence Trendmaker offers that purports to show a transaction in interstate commerce are two earnest money checks drawn on out-of-state banks by homeowners LeBlanc and Woodard. This isolated factor is

insufficient to constitute interstate commerce and invoke the FAA. *See Jack B. Anglin Co.*, 842 S.W.2d at 270 & n. 6.

7. The arbitration provision at issue here is broad form in nature, evidencing the parties' intent to be inclusive rather than exclusive. *See Pepe Int'l Dev. Co. v. Pub Brewing Co.*, 915 S.W.2d 925, 928, 930 (Tex.App.-Houston [1st Dist.] 1996, no writ) (construing arbitration clause containing language providing "any controversy or claim arising out of and/or related to this contract, or to the breach thereof, shall be settled by binding arbitration" as broad form in nature).

by the homeowners fall within the scope of the agreement. We must thus consider whether the homeowners established their unconscionability defense.

## C. Unconscionability

▮▮▮▮ A party may revoke an arbitration agreement only on a ground that exists at law or in equity for the revocation of a contract. TEX. CIV. PRAC. & REM.CODE ANN. § 171.001 (Vernon 2005). Unconscionability is a defense to an arbitration agreement. *See id.* § 171.022; *In re FirstMerit Bank,* 52 S.W.3d at 756. Because the law favors arbitration, the party opposing arbitration bears the burden to prove unconscionability. *See In re First-Merit Bank,* 52 S.W.3d at 756. The test for unconscionability is "whether, given the parties' general commercial background and the commercial needs of the particular trade or case, the clause involved is so one-sided that it is unconscionable under the circumstances existing when the parties *made the contract." Id.* at 757 (emphasis added). Unconscionability includes: (1) procedural unconscionability, which refers to the circumstances surrounding the adoption of the arbitration provision; and (2) substantive unconscionability, which refers to the fairness of the arbitration provision itself. *In re Halliburton Co.,* 80 S.W.3d 566, 571 (Tex.2002). Courts may consider both procedural and substantive unconscionability when evaluating the validity of an arbitration provision. *Id.* at 572. Because the trial court found the arbitration clause at issue here both procedurally and substantively unconscionable, we consider both issues in turn.

### 1. Procedural Unconscionability

▮▮▮▮ Trendmaker challenges the trial court's determination the arbitration provision is procedurally unconscionable in its second and fourth issues. In these issues, Trendmaker asserts the homeowners' claims of fraudulent inducement[8] (1) attacked the purchase agreement in its entirety and thus should have been submitted to the arbitrator and (2) were unjustified as a matter of law. Procedural unconscionability relates to the actual making or inducement of the contract. *In re Rangel,* 45 S.W.3d 783, 786 (Tex.App.-Waco 2001, orig. proceeding). This aspect of unconscionability focuses on the facts surrounding the bargaining process. *Id.* The party contesting the arbitration provision bears the burden to show unconscionability in how the parties arrived at their bargain. *See id.* Claims of procedural unconscionability are reserved for judicial review and are considered on a case-by-case basis. *Id.*

▮▮▮▮ As to Trendmaker's contention that the homeowners' claim of fraudulent inducement attacked the purchase agreement in its entirety, arbitration provisions are generally "separable" from the contracts in which they are contained. *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 402–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967); *Am. Med. Techs., Inc.,* 149 S.W.3d at 272. Thus, when a party's claim of fraudulent inducement is directed at the contract as a whole, rather than at the arbitration claim itself, the issue must be determined by an arbitrator. *Am. Med. Techs., Inc.,* 149 S.W.3d at 272 (citing *Prima Paint,* 388 U.S. at 403–04, 87

---

**8.** We recognize fraudulent inducement is generally a separate defense from unconscionability. *See In re FirstMerit Bank,* 52 S.W.3d at 756–58. However, the parties have incorporated fraudulent inducement into the discussion of the unconscionability defense. *See*

*Universal Computer Consulting Holding, Inc. v. Hillcrest Ford Lincoln–Mercury, Inc.,* Nos. 14–04–00819–CV, 14–04–01103–CV, 2005 WL 2149508, at *2 n. 6 (Tex.App.-Houston [14th Dist.] Sept. 8, 2005, no pet.) (not designated for publication).

S.Ct. 1801). Conversely, when a party's claim of fraudulent inducement is directed at the arbitration provision itself, the court decides the dispute. *Id.* Accordingly, defenses, such as unconscionability, concerning the contract as a whole must be referred to an arbitrator; defenses to the arbitration provision itself are considered by the court. *Id.* Here, the homeowners assert that, had Trendmaker disclosed the environmental contamination in the area, they would not have signed the purchase agreements at all; however, the homeowners also specifically and repeatedly assert they would not have agreed to the arbitration provision itself had they known it encompassed any disputes beyond structural defects in their houses, which they believed were covered by the warranty program. Thus, we construe the homeowners' challenges as directed to their agreement to the arbitration provision itself, a matter determined by the court. Accordingly, we overrule Trendmaker's fourth issue, and consider whether the homeowners established their agreement to the arbitration provision was fraudulently induced.

■■■■ Absent fraud, a party to a contract may not successfully claim he believed the provisions of a contract were different from those plainly set out in the contract or he did not understand the language used. *In re Media Arts Group,* 116 S.W.3d 900, 908 (Tex.App.-Houston [14th Dist.] 2003, orig. proceeding). As is rele-

vant here, fraud consists of a material misrepresentation that was knowingly or recklessly made with the intent that the other party act upon it, and the other party's actual and justifiable reliance on the misrepresentation caused injury. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.,* 51 S.W.3d 573, 577 (Tex.2001).

■■■■ To support their claims of fraudulent inducement and procedural unconscionability, the homeowners submitted their own affidavits. Each homeowner's affidavit contained language substantially similar to the following (quoted from homeowner Brooks' affidavit): [9]

It was my *understanding* that Paragraph 20, entitled Arbitration/Limitation on Claims, set forth in the Purchase Agreement that we were required to sign, was intended to relate to defects in the construction of our house. Trendmaker made this representation to me in the Purchase Agreement and other materials provided to me by Trendmaker. In particular, Trendmaker represented to me that arbitration would apply to defects in the construction of the home which would be covered by the Warranty Plus Program.

At no time, was it ever explained to me that paragraph 20 would apply to anything else besides construction defects. To the extent that Trendmaker now takes a different position, *I believe* they are wrong and they materially mis-

---

**9.** There is some slight variation among the affidavits filed by the homeowners. For example, several of the homeowners' affidavits state Trendmaker's "agent" represented to them that arbitration applied only to construction defects. They also contain statements to the effect that, had they known Trendmaker would attempt to compel arbitration in a case such as this, involving fraud and nondisclosure of environmental issues, they would never have agreed to the arbitration provision. Additionally, homeowner

Garth, an attorney with extensive experience in construction defect cases, including several involving similar arbitration clauses, further states in one of his affidavits, "Upon inquiry, Trendmaker's agent specifically represented to me that the arbitration clause would only apply to claims for defects in the construction of the home which would be covered by the Warranty Plus Program." Ultimately, however, none of these variations in the language of the affidavits affect our disposition of this issue.

represented the meaning or intent of arbitration. I would never have signed the arbitration agreement or the Purchase Agreement, if Trendmaker [had] told me the arbitration clause meant to apply to anything else besides construction defects for which we were protected or covered by the Warranty Plus Program.

(emphasis added). Initially, the homeowners assert that, through the verbiage in the arbitration provision and "other materials," Trendmaker or its "agent" misrepresented the scope of the agreement. Specifically, each appellee attests it was his or her understanding from reading the arbitration provision and the undisclosed "other materials" that the arbitration provision was limited to construction defects in the home.

The evidentiary standards for a motion to compel arbitration are the same as for a motion for summary judgment. *In re Jebbia,* 26 S.W.3d 753, 756–57 (Tex.App.-Houston [14th Dist.] 2000, orig. proceeding). Thus, it follows that affidavits of an interested witness, such as each of the homeowners here, submitted in opposition to a motion to compel arbitration must be clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and readily controvertible. *Cf.* Tex.R. Civ. P. 166a(c) (summary judgment evidentiary standards); *Trico Techs. Corp. v. Montiel,* 949 S.W.2d 308, 310 (Tex. 1997) (same). "Readily controvertible" means the testimony could have been effectively countered by opposing evidence. *Cf. Trico Techs. Corp.,* 949 S.W.2d at 310. Self-serving statements in affidavits of interested witnesses concerning their state of mind are uncontrovertible because the

mental workings of an individual's mind are matters about which adversaries have no knowledge or ready means of confirming or controverting. *Cf. Lection v. Dyll,* 65 S.W.3d 696, 701 (Tex.App.-Dallas 2001, pet. denied). Moreover, an interested witness's affidavit reciting the affiant "believes" certain things will not defeat a motion to compel arbitration as such language does not positively and unqualifiedly represent that the "facts" disclosed are true. *Cf. Ryland Group, Inc. v. Hood,* 924 S.W.2d 120, 122 (Tex.1996).

In its numerous filings with the trial court on the issue of the enforceability of the arbitration clause, Trendmaker repeatedly objected that the homeowners' affidavits, stating their understanding of the arbitration clause, offered no evidence that Trendmaker made any misrepresentations regarding the arbitration clause. We agree. The homeowners' affidavits attesting to their understanding of the scope of the arbitration clause and their belief Trendmaker's interpretation of that arbitration clause is wrong constitute no evidence as they (1) are not readily controvertible, (2) are not based on the affiants' personal knowledge, and (3) do not unqualifiedly represent that the alleged "facts" are true.[10] *Cf. Ryland Group, Inc.,* 924 S.W.2d at 122; *Lection,* 65 S.W.3d at 701. Because a lot of no evidence is still no evidence, the trial court erred in invalidating the arbitration provision based on the conclusory allegations of fraud found in these affidavits. *See Nissan Motor Co. Ltd. v. Armstrong,* 145 S.W.3d 131, 148 (Tex.2004), *In re Media Arts Group,* 116 S.W.3d at 908–10.

---

**10.** Additionally, other than a statement in Garth's affidavit, there was no evidence from the other homeowners that they asked any questions or requested any explanations of the arbitration provision. *See In re Rangel,* 45 S.W.3d at 787 (noting that the lack of questions or requests for explanations of a contract supported the trial court's finding that there was no showing of procedural unconscionability).

■ Moreover, as Trendmaker correctly points out, one of the elements of a fraud claim is that the plaintiff actually and *justifiably* relied on the misrepresentation. *DRC Parts & Accessories, L.L.C. v. VM Motori, S.P.A.,* 112 S.W.3d 854, 858 (Tex.App.-Houston [14th Dist.] 2003, pet. denied) (en banc). In this regard, a party to an arm's length transaction, such as each of the homeowners, must exercise reasonable diligence for the protection of his or her own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party. *Id.* Therefore, reliance upon an oral representation that is directly contradicted by the express, unambiguous terms of a written agreement between the parties is not justified as a matter of law. *Id.*

As discussed above, nothing in the arbitration provision itself indicates that it is limited to construction defects, as the homeowners claim they believed it was. Moreover, the purchase agreement contains a merger clause, explicitly stating that Trendmaker is not bound by any

> statement, promise, condition or stipulation not specifically set forth in this Agreement .... no sales consultant, employee, or agent of [Trendmaker] has authority to modify the terms of this Agreement or make any representation of agreement not contained in this Agreement, and anything to the contrary shall not be binding upon [Trendmaker].

Finally, the agreement states:

> PURCHASER ACKNOWLEDGES AND REPRESENTS THAT PURCHASER HAS READ AND UNDERSTANDS THIS AGREEMENT, AND ALL ATTACHMENTS, AND THAT PURCHASER HAS NOT RECEIVED ANY REPRESENTATIONS AND IS NOT RELYING ON ANY STATEMENT, PROMISE, CONDITION OR STIPULATION NOT SPECIFICALLY SET FORTH IN THIS AGREEMENT OR THE ATTACHMENTS.

The homeowners' affidavits indicate they were relying on statements, promises, conditions or stipulations not set forth in the purchase agreement,[11] in direct conflict with the express language of the agreement. Thus, they constitute no evidence of justifiable reliance, an essential element of their affirmative defense. As the homeowners produced no evidence supporting all the elements of their affirmative defense to arbitration, the trial court abused its discretion in concluding the arbitration clause was procedurally unconscionable and denying Trendmaker's motion to compel arbitration on this basis. *See Valero,* 2 S.W.3d at 581. We sustain Trendmaker's second issue.

### 2. Substantive Unconscionability

■ In its third issue, Trendmaker asserts that the trial court abused its discretion in determining that the arbitration clause was substantively unconscionable based on the homeowners' contention it would force them to incur excessive costs in arbitrating their claims, resulting in an undue financial hardship. Under certain circumstances, arbitration can be so cost-prohibitive it effectively precludes a litigant from exercising his statutory right to seek redress. *In re FirstMerit Bank, N.A.,* 52 S.W.3d at 756 (citing *Green Tree Fin. Corp. v. Randolph,* 531 U.S. 79, 90, 121 S.Ct. 513, 522, 148 L.Ed.2d 373 (2000)). In such a case, the arbitration agreement may be invalidated. *Id.* However, the party opposing arbitration must prove the

---

**11.** Nor have the homeowners provided any attachments to the purchase agreement supporting their claims.

likelihood of incurring such substantial costs through "*some* specific information." *See id.* (quoting *Green Tree Fin. Corp.*, 531 U.S. at 92, 121 S.Ct. at 522–23).

In support of their claims, the homeowners provided affidavit evidence by an expert, Raymond Kerr, an attorney and construction and commercial arbitration panelist with the American Arbitration Association (the "AAA"). Kerr attested that, based on his experience, "the AAA would require a three-arbitrator panel." He further estimated that arbitration could cost up to $115,200, plus AAA administrative fees. In addition, homeowner Garth, an attorney with construction arbitration experience, attached a copy of an AAA fee schedule to his affidavit. He attested that "AAA arbitors charge thousands of dollars even before hearings commence" and estimated arbitration costs "in the range of $45,000 to $120,000." The original plaintiffs each also submitted affidavits summarizing the fees and expenses they expected to incur through arbitrating this matter and indicating that "the costs and expenses of AAA arbitration are not economically feasible." The intervenors likewise submitted affidavits stating they could not afford to pay anywhere near the experts' estimated arbitration costs of $45,000 to $120,000 without "undue hardship." Finally, the homeowners cite several cases holding that specific evidence regarding the potentially exorbitant costs of arbitration may render an arbitration agreement substantively unconscionable.[12]

Importantly, all the homeowners' specific evidence regarding arbitration costs rely on estimates of costs and fees of arbitration conducted by the AAA.[13] However, while there is some indication in our record that Trendmaker may prefer arbitration through the AAA, the arbitration provision at issue in this case does not *require*

**12.** *See, e.g., Olshan Found. Repair Co. v. Ayala,* 180 S.W.3d 212, 214–16, & n. 4 (Tex.App.-San Antonio 2005, pet. denied) (determining that the trial court properly denied arbitration where a family conclusively established (1) they had filed a claim with the AAA, (2) the AAA had determined that three structural engineers would conduct the arbitration, and (3) the AAA had provided the m with an invoice in the amount of $33,150, which was over twenty-five percent of the family's annual gross income, as their portion of the arbitration expenses, in addition to a $4,130 filing fee); *In re Luna,* 175 S.W.3d 315, 328 (Tex. App.-Houston [1st Dist.] 2004, orig. proceeding [mand. pending] ) (finding the trial court abused its discretion by compelling arbitration between an employer and employee largely due to the high costs of arbitration, amounting to more than one-half the employee's annual compensation, imposed on the employee *and* the limitations on his remedies under the arbitration agreement, which rendered the agreement "so one-sided in [the employer's] favor and so oppressive to [the employee] as to be substantively unconscionable, given the strong legislative policy behind the Worker's Compensation Act"). In contrast, the homeowners here have not initiated arbitration with any arbitrator at all, the arbitration provision does not limit the homeowners' remedies or provide for any fee splitting arrangement, the homeowners have not presented any specific evidence regarding their inability to afford arbitration other than conclusory statements in their affidavits that they cannot afford the experts' estimated AAA costs and fees, and this case presents no public policies countervailing the fact that Texas law strongly favors arbitration.

**13.** Moreover, the AAA construction arbitration rules in effect here provide that the AAA may reduce or defer administrative fees in the event of extreme hardship on any party. *See* AM. ARBITRATION ASS'N, CONSTR. INDUS. ARBITRATION RULES & MEDIATION, *R–50: Administrative Fees* (eff. Sept. 15, 2005), *available at* http://www. adr.org/sp.asp?id=22004# R50; *cf. FirstMerit Bank,* 52 S.W.3d at 757 (noting that one of the factors militating against the party seeking to avoid arbitration by showing excessive fees charged by the AAA was the AAA's commercial arbitration rule regarding deferral or reduction of fees in the event of extreme hardship).

that the AAA determine this dispute. Instead, the clause states disputes "shall be decided by arbitration *in accordance with* the Construction Industry Arbitration Rules of the American Arbitration Association promulgated by the American Arbitration Association" (emphasis added). Such language may authorize the AAA to administer the arbitration,[14] but it does not mandate arbitration *by* the American Arbitration Association.[15] Indeed, Trendmaker provided affidavit evidence that a dispute involving other homeowners in the same subdivision, bringing similar claims under the same purchase agreement containing the same arbitration provision as we have here was resolved through arbitration by an independent arbitrator at a significantly lower cost than the AAA costs attested to by the homeowners' experts.[16] Because less expensive alternate methods of resolving this dispute are available, we need not consider whether the appellees' affidavits regarding the cost of arbitration by AAA arbitrators will be incurred for purposes of determining the substantive unconscionability of the arbitration clause.

In sum, the homeowners have identified no evidence or legal authority that this dispute must be arbitrated through the AAA or that they will actually be charged the fees they have identified. *Cf. In re FirstMerit Bank*, 52 S.W.3d at 757 (concluding there was legally insufficient evidence the plaintiffs would be denied access to arbitration based on excessive costs largely due to a lack of evidence the AAA would actually conduct the arbitration). Moreover, if the parties are unable to agree on an arbitrator or if the agreed method fails or cannot be followed, the TGAA authorizes the trial court to appoint an arbitrator. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 171.041(b)(1), (2) (Vernon 2005). Under these circumstances, the trial court erred in finding this arbitration provision substantively unconscionable. Thus, we sustain Trendmaker's third point of error.

### CONCLUSION

Having sustained Trendmaker's second and third points of error, we need not address the remaining issues. Because Trendmaker proved the existence of an arbitration agreement encompassing the claims at issue and the homeowners failed to prove their unconscionability defense, we hold the trial court erred in denying Trendmaker's motion to compel arbitration of the homeowners' claims.

Accordingly, we reverse the trial court's May 13, 2005 order and remand this case for further proceedings consistent with this opinion. Because we find there exists an adequate remedy by appeal, Trendmak-

**14.** *See* AM. ARBITRATION ASS'N, CONSTR. INDUS. ARBITRATION RULES & MEDIATION, *R–2: AAA and Delegation of Duties* (eff. Sept. 15, 2005), *available at* http://www.adr.org/sp.asp?id=22004# R2; *see also Ambulance Billings Sys. Inc. v. Gemini Ambulance Servs. Inc.*, 103 S.W.3d 507, 515 (Tex.App.-San Antonio 2003, no pet.) (noting that a trial court did not abuse its discretion by ordering arbitration by the AAA when similar language was included in the arbitration provision).

**15.** Likewise, an agreement authorizing the purchase of Gucci loafers does not prevent the parties from deciding to buy cheaper shoes. In fact, evidence of the high relative cost of Gucci shoes may create a bias in favor of less expensive footwear.

**16.** Moreover, as discussed above, the initial court order compelling arbitration (that was later withdrawn after various plaintiffs were added and a motion to reconsider was filed) prescribed arbitration proceedings "consistent with the terms and conditions of the Purchase Agreements ... *or as otherwise agreed upon by the parties.*" (Emphasis added).

er's petition for writ of mandamus is denied.