**Petition for Writ of Mandamus Conditionally Granted and Opinion filed September 11, 2012.**



**In The**

# Fourteenth Court of Appeals

———————————

**NO. 14-12-00329-CV**

———————————

## IN RE GUGGENHEIM CORPORATE FUNDING, LLC, ORPHEUS HOLDINGS LLC, STELLAR FUNDING LTD., and ORPHEUS FUNDING LLC, Relators

**ORIGINAL PROCEEDING**
**WRIT OF MANDAMUS**
**234th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-36283**

## OPINION

Relators, Guggenheim Corporation Funding, LLC, Orpheus Holdings LLC, Stellar Funding Ltd., and Orpheus Funding LLC (referred to collectively as Guggenheim unless otherwise stated), filed a petition for writ of mandamus in this court. *See* Tex. Gov't Code §22.221; *see also* Tex. R. App. P. 52. In the petition, Guggenheim asks this court to compel the Honorable Reece Rondon, presiding judge of the 234th District Court of Harris County, to vacate his order signed March 19, 2012, denying Guggenheim's motion to enforce jury waiver agreements, and direct him to grant the motion. At issue in this proceeding is the scope of the jury waiver agreements. We conditionally grant the writ.

## BACKGROUND OF THE UNDERLYING DISPUTE

The real party-in-interest, Valerus Compression Services, LP (Valerus), sued Guggenheim to obtain rescission of 2009 amendments to three warrants[1] issued in 2006 in connection with a $165 million loan. Valerus asserts that the 2009 amendments were procured by mistake and/or fraud. The loan, referred to as a credit facility, was arranged by Guggenheim, who served as the administrative agent for the lenders. The terms of the credit facility are set out in a Credit Agreement between Valerus, Guggenheim, and various lenders dated August 10, 2006. In connection with the Credit Agreement, Valerus (1) agreed to pay certain fees to Guggenheim as set out in a Fee Letter, and (2) issued a warrant to Guggenheim for the purchase of units of Valerus's partnership interest. The Original Warrant agreement assigned Guggenheim the right to obtain an equity interest in Valerus by purchasing 954,292 Class B units for $.01 per unit at any time before August 10, 2011.

The parties agree that the mutual intent in the Original Warrant was to: (1) grant to Guggenheim the right to purchase partnership units representing 3.5% of Valerus's equity as of August 10, 2006, the date of the warrant's issuance; and (2) grant limited, customary anti-dilution protection for non-cash share transactions, although Guggenheim's 3.5% would be diluted if Valerus sold new equity after the issuance of the warrant.

In 2007, Valerus paid off the loan under the Credit Agreement. Even though the loan was repaid, the rights and obligations under the unexercised Original Warrant remained. In 2008, the Original Warrant was canceled at Guggenheim's request and reissued as three separate warrants, dividing the option to purchase shares of Valerus among the three Guggenheim affiliates named as relators in this proceeding. The 2008 warrants are referred to by the parties as the Interim Warrants.

In February of 2009, in connection with a proposed new financing agreement that was ultimately not consummated, Valerus and Guggenheim began negotiations about

---

[1] Valerus describes a warrant as a derivative security that gives the holder the right to purchase securities from the issuer at a specific price within a certain time frame.

amending the Interim Warrants. During these negotiations, Valerus was represented by its former general counsel, Dawn Born Cunningham, as well as by capable outside counsel, King & Spalding. According to Valerus, these negotiations included discussions about purported ambiguities in the anti-dilution language of the Original Warrant that had been carried forward in the Interim Warrants.

To facilitate this anticipated refinancing, Valerus issued three amended warrants in April of 2009, referred to as the Amended Warrants, which gave Guggenheim's affiliates the right to acquire 3.5% of Valerus's outstanding equity *"calculated at the time of exercise"*—not, as with the previous warrants, a fixed number of shares representing 3.5% of Valerus's equity as of August 10, 2006. (emphasis supplied). As with the previous warrants, the Amended Warrants provided that they could be exercised on or before August 10, 2011.

Valerus subsequently entered into a recapitalization agreement with TPG Capital, L.P. This transaction diluted the ownership percentage of Valerus's existing limited partners through the issuance of over 100,000,000 new shares to TPG. As a result of the recapitalization transaction, Valerus states that its existing limited partners' ownership in the company decreased from 100% to 18.10%. Because Guggenheim was entitled under the Amended Warrants to receive 3.5% of the outstanding units at the time of exercise, the TPG transaction substantially increased the number of units Guggenheim had the right to acquire upon exercise of the warrants by August 2011.

Valerus contends that when it realized the Amended Warrants had actually changed the parties' intent with respect to the number of shares Guggenheim would be entitled to purchase upon exercise of the Amended Warrants, it engaged in a series of discussions with Guggenheim in an attempt to resolve the dispute. Guggenheim ultimately refused to rescind the Amended Warrants. Valerus claims that Guggenheim's Managing Director, Tim Murray, acknowledged that Guggenheim had taken windfall from Valerus, referring

3

to the Amended Warrants as "pennies from heaven," and stating that it was like Guggenheim "won the lottery."

Valerus then filed suit and demanded a jury, claiming it was deceived when it agreed to the Amended Warrants. Valerus asserts that its general counsel had not been involved in the original transaction and was unfamiliar with the negotiations surrounding the Original Warrant. She was also in the midst of recovery from cancer surgery and undergoing extensive testing during the time that Valerus and Guggenheim negotiated the issuance of the Amended Warrants. According to Valerus, Guggenheim took advantage of its counsel's unfamiliarity with the transaction and her preoccupation with her serious medical condition and induced Cunningham to agree to material modifications of the warrants. Valerus concedes, however, that its Chief Financial Officer told Cunningham in 2009 that he understood the original anti-dilution provision to provide that Guggenheim's 3.5% interest was intended to be calculated at the time the Original Warrant was exercised. Valerus asserts that he was mistaken; either he did not remember correctly or he did not understand the transaction. Valerus asserts that Guggenheim's counsel knowingly misrepresented that the Amended Warrants embodied the intent of the Original Warrant. Accordingly, Valerus seeks rescission of the Amended Warrants.

In July of 2011, Valerus sought a temporary injunction to prevent exercise of the Amended Warrants. After a hearing, the trial court denied the application and allowed Guggenheim to exercise the Amended Warrants. Guggenheim then moved to strike Valerus's jury demand, the trial court denied its request after a hearing, and Guggenheim filed this proceeding.

4

**THE JURY WAIVERS**

There are two jury waivers at issue in this proceeding. First, the original Credit Agreement executed in 2006 contains a conspicuous jury waiver.[2] *See In re General Electric*, 203 S.W.3d 314, 316 (Tex. 2006) (per curiam) (finding a jury waiver was conspicuous where it was set apart from the rest of the text and printed in bold with all capital letters). The Credit Agreement's jury waiver applies to "any legal action or proceeding relating to this agreement or any other Loan Document . . . ." Loan Documents are broadly defined in the agreement to include, in addition to the credit agreement, notes, security documents, and fee letter, "each other agreement or document executed by a Loan Party and delivered to the Administrative Agent or any Lender."[3] The definition also expressly includes any amendments to the documents.

The Fee Letter, which was executed at the same time as the Original Warrant and incorporated it by reference, also contains a conspicuous jury waiver. *See In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (stating that documents incorporated into a contract by reference become part of that contract). The Fee Letter's irrevocable jury waiver applies to any action "arising out of or relating to this Fee Letter or the transactions contemplated hereby or the actions of the parties hereto in the negotiation, performance or enforcement hereof." Any uncertainty about whether the Original Warrant is included in the broad

---

[2] Section 10.15 of the Credit Agreement is entitled "WAIVERS OF JURY TRIAL" and states as follows:

> 10.15 WAIVERS OF JURY TRIAL. THE BORROWER [Valerus], THE ADMINISTRATIVE AGENT [Guggenheim], AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

[3] "Loan Documents" are defined in the agreement as:

> "Loan Documents": this Agreement, the Security Documents, the Notes, the Fee Letter dated the date hereof between the Borrower and the Administrative Agent, each other agreement or document executed by a Loan Party and delivered to the Administrative Agent or any Lender in connection with or pursuant to any of the foregoing, and any amendment, restatement, extension, waiver or modification of any of the foregoing.

definition of Loan Documents as an "other agreement" is clarified in the Fee Letter, which expressly states that the Original Warrant is a Loan Document.

## MANDAMUS STANDARD

Mandamus is an extraordinary remedy that will issue only if (1) the trial court clearly abused its discretion and (2) the party requesting mandamus relief has no adequate remedy by appeal. *In re Prudential Ins. Co. of Am*., 148 S.W.3d 124, 135-36 (Tex. 2004). A trial court has no discretion in determining what the law is or applying the law to the facts. *Walker v. Packer*, 827 S.W.2d 833, 840 (Tex. 1992).

A party seeking relief from the refusal to enforce a valid contractual jury waiver has no adequate remedy at law and is entitled to mandamus relief to correct a clear abuse of discretion by the trial court. *Prudential,* 148 S.W.3d at 135-40; *see also In re Frank Motor Co.,* 361 S.W.3d 628, 632 (Tex. 2012) (granting mandamus to enforce jury waiver in employment contract); *In re Key Equip. Fin., Inc.,* 371 S.W.3d 296, 303 (Tex. App.—Houston [1st Dist.] 2012, orig. proceeding) (granting mandamus to enforce jury waiver in commercial lease).

## THE ISSUES

Guggenheim raises two issues in its petition, asserting that the trial court clearly abused its discretion in (1) refusing to enforce two conspicuous, irrevocable and broad jury waiver provisions contained in separate agreements by erroneously concluding that Valerus's claims are outside their scope; and (2) failing to give the expansive phrases "arising out of" and "relating to" in the jury waiver provisions their proper meaning.

Guggenheim argues that the relevant loan documents contain two conspicuous jury waiver provisions. The waivers are "irrevocable," extremely broad, and apply to all matters "relating to" "any" Loan Document. Any uncertainty about whether the Original Warrant is included in the broad definition of Loan Documents as an "other agreement" is clarified in the Fee Letter, which expressly states that the Original Warrant is a Loan Document. The

6

jury waivers apply to any amendments or modifications of "any" Loan Document. In addition, because Valerus relies on the intent behind the Original Warrant in alleging its fraud claims, Guggenheim asserts that this suit is related to the Original Warrant and within the scope of the jury waivers in the 2006 financing documents.

Valerus does not argue that the jury waivers are unenforceable; instead, Valerus disputes that its lawsuit is covered by either waiver. Valerus contends that its suit is based on the execution of the Amended Warrants, which are new agreements, not "Loan Documents" covered by the 2006 agreements and subject to the jury waiver provisions therein. Valerus asserts that its fraud claims are not within the scope of the 2006 jury waiver provisions because it did not knowingly and voluntarily waive its right to a jury trial for the subsequent fraud in the issuance of the Amended Warrants.

Therefore, to determine whether the trial court abused its discretion in refusing to enforce the jury waiver agreements, we must determine whether this dispute falls within the scope of the jury waiver provisions. *See generally In re Lisa Laser USA, Inc.,* 310 S.W.3d 880, 884 (Tex. 2010) (orig. proceeding) (per curiam) (granting mandamus to enforce contractual forum selection clause where clause was within the scope of the claims at issue because they arose out of the contract). In resolving this question, we will address Guggenheim's issues together.

## DISCUSSION AND ANALYSIS

A party may agree to waive its constitutional right to a jury trial. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 132 (Tex. 2004). A contractual jury waiver does not violate public policy and is enforceable as long as the waiver is voluntary, knowing, and made with full awareness of the legal consequences. *Id.*

In *Bank of America,* the Texas Supreme Court held that *Prudential* does not impose a presumption against jury waivers, and therefore, the burden is not placed on the party seeking enforcement to prove that the opposing party knowingly and voluntarily agreed to

waive its constitutional right to a jury trial. *In re Bank of Am., N.A.,* 278 S.W.3d 342, 343 (Tex. 2009).[4] The court recited two bases for its ruling. First, a presumption against a jury waiver would incorrectly place the initial burden on the party seeking to enforce the waiver. *Id.* A conspicuous waiver is prima facie evidence that the party knowingly and voluntarily waived its constitutional right to a jury trial. *In re General Elec. Capital Corp.*, 203 S.W.3d 314, 316 (Tex. 2006) (per curiam). Second, a presumption against a jury waiver would create an "unnecessary distinction" between arbitration and jury waiver clauses, when the court has expressed that Texas "jurisprudence should be the same for all similar dispute resolution agreements." *Bank of Am.,* 278 S.W.3d at 343-44 (citing *Prudential,* 148 S.W.3d at 134) (holding that the court of appeals' analysis erred by distinguishing jury waivers from arbitration clauses).

An allegation of fraud in the execution of the waiver provision itself may shift the burden to prove the jury waiver was executed knowingly and voluntarily. *Bank of Am.,* 278 S.W.3d at 345. The Texas Supreme Court rejected the argument that a jury waiver should not be enforced when it is part of an agreement that is alleged to have been fraudulently induced, however. *See Prudential,* 148 S.W.3d at 134. In *Prudential,* the court noted that the party opposing the contractual jury waiver provision did not "claim that they were tricked into agreeing" to the waiver, although they did claim that they were fraudulently induced to execute the contract when the enforcing party concealed facts that would have dissolved the entire contract. *Id.*

> Any provision relating to the resolution of future disputes, included as part of a larger agreement, would rarely be enforced if the provision could be avoided by a general allegation of fraud directed at the entire agreement. The purpose of such provisions—to control resolution of future disputes—would

---

[4] Valerus cites a 2008 decision from this court refusing to enforce a contractual jury waiver against a non-signatory, stating that jury waivers "are strictly construed and will not be lightly inferred or extended." *See In re Credit Suisse First Boston Mortg. Capital, L.L.C.,* 257 S.W.3d 486, 490 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). The Texas Supreme Court has since made it clear that jury waivers are not disfavored and they should be enforced just as other dispute resolution agreements. *Bank of Am.,* 278 S.W.3d at 344.

be almost entirely defeated if the assertion of fraud common to such disputes were enough to bar enforcement. The United States Supreme Court has explained that arbitration and forum-selection clauses should be enforced, even if they are part of an agreement alleged to have been fraudulently induced, as long as the specific clauses were not themselves the product of fraud or coercion. . . . [T]he rule should be the same for all similar dispute resolution agreements.

*Id.* at 134-35 (citations omitted).

Valerus contends that the Texas Supreme Court has addressed only the enforceability of jury waivers, and the court's pronouncements do not affect Valerus's contention that the *scope* of a jury waiver should be narrowly construed. We disagree. Other dispute resolution clauses are not construed narrowly, and the court has explained that jury waivers are no more restrictive of a party's rights than these other clauses. For example, the Texas Supreme Court recognized that "[a]rbitration removes the case from the court system almost altogether, and is every bit as much of a surrender of the right to a jury trial as a contractual jury waiver." *See In re Frank Kent Motor Co.*, 361 S.W.3d 628, 632 (Tex. 2012) (orig. proceeding) (applying arbitration decisions and rejecting claim that employee's coercion to sign a jury waiver in employment contract invalidated the waiver); *see also Prudential,* 148 S.W.3d at 132 (observing that party who agrees to arbitrate waives both right to jury trial and right to appeal).[5] This court has similarly recognized that a jury waiver is actually less restrictive that an arbitration clause. *See In re Wells Fargo Bank Min., N.A.,* 115 S.W.3d 600, 607 (Tex. App.—Houston [14th Dist.] 2003, orig. proceeding). "Although parties agreeing to arbitrate waive considerably more than just the right to a jury trial, arbitration is strongly favored under Texas law." *Id.* In deciding a then-issue of first impression, we compelled enforcement of a contractual jury waiver in loan documents, finding no adequate remedy by appeal for the loss of relator's

---

[5] An agreement to arbitrate is in effect a specialized kind of forum section clause. *See In re AIU Ins. Co.,* 148 S.W.3d 109, 115 n.28 (Tex. 2004) (applying arbitration case in rejecting claim that forum selection was waived).

9

bargained-for right to a "less costly and more expeditious resolution than a jury trial." *Id.* at 611.

A forum selection clause also typically has a far more devastating impact on a plaintiff than a jury waiver clause by causing a plaintiff to litigate out-of-state and lose certain Texas procedural safeguards. Yet, enforcement of forum selection clauses is "mandatory" unless the opposing party clearly shows that enforcement would be unreasonable or unjust, or that the clause is invalid for reasons such as fraud or overreaching. *In re Auto. Collection Tech., Inc.*, 156 S.W.3d 557, 558 (Tex. 2004).

Based on these authorities, we conclude that both the enforcement and scope of jury waivers should be determined in the same manner as other dispute resolution agreements, and we will look to decisions addressing those agreements in deciding whether the jury waivers apply in this case. Our sister court has already held that in light of the strong public policy favoring freedom of contract, contractual jury waivers deserve no more scrutiny than agreements to waive the judicial forum entirely and arbitrate any future dispute. *In re Key Equip. Fin., Inc.,* 371 S.W.3d at 301; *see also Nafta Traders, Inc. v. Quinn*, 339 S.W.3d 84, 95 (Tex. 2011) ("As a fundamental matter, Texas law recognizes and protects a broad freedom of contract."). In *Key,* the First Court of Appeals granted mandamus relief to enforce a contractual jury waiver in a commercial lease, even though the waiver was not conspicuous, holding that the relator established the waiver was voluntarily executed. *Key,* 371 S.W.3d at 303.

We reject Valerus's contention that the trial court's determination of the scope of the jury waivers actually encompasses the resolution of a factual dispute. A trial court's determination of an arbitration agreement's validity is a legal question subject to *de novo* review. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 227 (Tex. 2003). Similarly, a determination of the scope of an unambiguous arbitration clause is a matter of contract interpretation and a question of law for the trial court. *See Osornia v. AmeriMex Motor & Controls, Inc.*, 367 S.W.3d 707, 710-11 (Tex. App.–Houston [14th Dist.] 2012, no pet.);

10

*McReynolds v. Elston*, 222 S.W.3d 731, 740 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (reviewing scope of a contract's arbitration clause under *de novo* standard). Therefore, a determination of the scope of the jury waiver in this case is a question of law.

Arbitration agreements are interpreted under traditional contract principles. *Jenkens & Gilchrist v. Riggs*, 87 S.W.3d 198, 201 (Tex. App.—Dallas 2002, no pet.). Contract terms will be given their plain, ordinary, and generally accepted meaning, unless the instrument shows the parties used them in a technical or different sense. *Dynegy Midstream Servs. L.P. v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex. 2009).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *J.M. Davidson,* 128 S.W.3d at 229. In the arbitration context, we must give effect to the parties' intent, whether enforcing an agreement to arbitrate or construing an arbitration clause. *Nafta Traders*, 339 S.W.3d at 90. To determine whether a party's claims fall within the scope of an arbitration agreement, we focus on the factual allegations, rather than the legal causes of action, asserted in the petition. *In re FirstMerit Bank, N.A.,* 52 S.W.3d 749, 754 (Tex. 2001). Following arbitration jurisprudence, we apply a common-sense examination of the underlying claim and the forum-selection clause to determine if the claim comes within the scope of the clause. *In re Lisa Laser USA*, *Inc.*, 310 S.W.3d 880, 884 (Tex. 2010) (orig. proceeding) (per curiam). The Texas Supreme Court has determined that a party may not attempt to avoid an arbitration or forum selection clause through artful pleading. *See In re Int'l Profit Assocs. I*, 274 S.W.3d 672, 677 (Tex. 2009) (orig. proceeding) (citing *In re Weekley Homes, L.P.,* 180 S.W.3d 127, 131–32 (Tex.2005) (construing scope of arbitration clause).

Guggenheim first argues that any claims that relate to the Original Warrant fall within the scope of the jury waiver in the Credit Agreement. Guggenheim argues that because the waiver contains the broad language that the parties "waive trial by jury in *any legal action or proceeding relating to this agreement or any other loan document,"* including "any amendment" or "modification" of such a document, any dispute concerning

11

the 2009 Amended Warrants is covered. (emphasis supplied). Guggenheim also points out that the Fee Letter states that the Original Warrant is a Loan Document. The parties agree that the Credit Agreement and the Fee Letter should be construed together. *See In re Laibe Corp.,* 307 S.W.3d 314, 317 (Tex. 2010). Therefore, Guggenheim asserts that the jury waiver applies to claims related to the Amended Warrants. We agree.

Courts interpret the phrases "relates to," "relating to," and "arising out of or relating to" broadly in forum selection clauses. *See, e.g., also Diamond Offshore (Bermuda), Ltd. v. Haaksman*, 355 S.W.3d 842, 848 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (enforcing "relating to" forum selection clause and holding that such clauses are broadly construed); *RSR Corp. v. Siegmund*, 309 S.W.3d 686, 701 (Tex. App.—Dallas 2010, no pet.) (enforcing forum selection clause applying to "arising out of or relating to" the agreement); *Deep Water Slender Wells, Ltd. v. Shell Int'l Exploration & Prod.*, *Inc*., 234 S.W.3d 679, 688-92 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) (affirming dismissal of tort claims under "arising out of or relating to" forum selection clause that extended to claims related to subsequent contract).

Arbitration agreements containing phrases such as "relating to" are also interpreted broadly. *See, e.g., In re Bank One, N.A.,* 216 S.W.3d 825. 826-27 (Tex. 2007) (resolving doubt as to scope of arbitration agreement covering disputes "arising from or relating in any way to this Agreement" in favor of coverage); *950 Corbindale, L.P. v. Kotts Capital Holdings Ltd. P'ship,* 316 S.W.3d 191, 196-97 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (holding that broad arbitration provision defining "disputes" as "any dispute under or related to the partnership agreement or any document executed pursuant to the partnership agreement or any of the transactions contemplated by the partnership agreement shall be subject to arbitration" applied to all claims); *TMI Inc. v. Brooks*, 225 S.W.3d 783, 791 n.7 (Tex. App.—Houston [14th Dist.] 2007, orig. proceeding) (holding that phrase "arising out of and/or related to" in arbitration agreement is "broad form in nature, evidencing the parties' intent to be inclusive rather than exclusive").

A jury waiver provision containing similar "related to" language has also been construed broadly. *See In re Frost Nat. Bank, N.A.,* 324 S.W.3d 320, 321 (Tex. App.—Dallas 2010, orig. proceeding). The Dallas Court of Appeals was faced with a jury waiver provision in a loan document that applied to claims that "arise out of, are connected to or are related to" the agreement or its subject matter. *Id.* The trial court refused to enforce the jury waiver, and the Dallas Court of Appeals granted the defendant's petition for writ of mandamus requiring its enforcement. *Id.* The court applied the "related to" provision broadly, holding that the jury waiver applied to the "subject matter" of the agreement, which included the underlying loans. *Id.* In reaching its decision, the court reasoned that jury waiver provisions are another type of forum selection clause. *Id.*

Valerus asserts that Guggenheim had repeatedly argued in the injunction hearing that the 2009 Amended Warrants are a "stand alone" new transaction, separate and apart from the 2006 transactions. Valerus argues that principles of equitable estoppel should prevent Guggenheim from now taking an inconsistent position that the jury waiver provisions in the earlier 2006 agreements apply to this 2009 "stand alone" new agreement. *See In re Dep't of Family & Protective Servs.*, 273 S.W.3d 637, 646 (Tex. 2009) (party estopped from taking position clearly adverse to position it unequivocally took at trial).

Guggenheim responds that there is no contradiction between its position that the 2009 Amended Warrants reflect a different bargain, made under different economic circumstances, that stands apart from the one reached in 2006, and Guggenheim's position that Valerus's claims in the underlying suit relate to the Original Warrant and are covered by the jury waivers. Guggenheim's position is not a "deliberate, clear, and unequivocal" statement clearly adverse to its prior arguments. *See Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 862 (Tex. 2005).

Moreover, we note that the Amended Warrants expressly state the following: "*Pursuant to a Credit Agreement, dated as of August 10, 2006*, . . . and for value received, this Warrant is hereby issued by the Company to the Holder." (emphasis supplied). Thus,

13

even though the 2009 Amended Warrants may have been the result of new negotiations, they were issued "pursuant to" the 2006 loan and are subject to the jury waivers relating to that loan.

Valerus's factual allegations confirm that this dispute falls within the scope of the jury waivers. Although Valerus asserts that its claims concern the Amended Warrants, a review of its pleadings reveals that its claims also relate to the intent of the parties in executing the Original Warrant. In its Second Amended Petition, Valerus alleges that the Amended Warrants materially changed the Interim Warrants, rather than the Original Warrant as it had first claimed. This "artful pleading" does not change the fact that the Interim Warrants were simply a re-issue of the Original Warrant dividing the option right among three Guggenheim affiliates. The heart of Valerus's claim is that it was deceived or mistaken about the negotiations, intent, and terms of the Original Warrant, and that it mistakenly believed that the Amended Warrant was simply a "ministerial" act "clarifying"—rather than substantively changing—the intent of the Original Warrant as reflected in the Interim Warrants. For example, Valerus alleged:

> There is no current dispute between the parties that their intent had been that the Original Warrant grant to Guggenheim shares representing 3.5% of Valerus on the date the Original Warrant was issued, not at the time the warrant was later exercised. The parties also intended that the Original Warrant include provisions granting limited, customary anti-dilution for non-cash share transactions; however, they also agreed that if Valerus sold new equity after the issuance of the warrant to Guggenheim, then Guggenheim's 3.5% would be diluted.

>       *          *          *

> While it is now undisputed that the mutual intent had been to grant 3.5% of the company as of August 2006 with no dilution protection for issuances of shares to equity investors, that is not what Ms. Cunningham was told in 2009.

>       *          *          *

14

With only her CFO's mistaken understanding of the parties' mutual intent and the ambiguous wording of the Interim Warrants, Ms. Cunningham reached out to the Guggenheim lawyer who had been involved in the 2006 negotiations to confirm and clarify the parties' original intent with respect to the calculation of the number of shares to be issued and the antidilution protection.

*       *       *

When she gave her erroneous understanding that the 3.5% was to be calculated at the time of exercise, the Guggenheim lawyer did not correct her. Instead, knowing that he was taking advantage of an organization that was completely mistaken about the rights and obligations under the Interim Warrants, the Guggenheim lawyer actually encouraged Ms. Cunningham in her erroneous belief.

We apply a common sense examination of the underlying claims and the dispute resolution clause to determine if the claim comes within the scope of the clause. *See Lisa Laser*, 310 S.W.3d at 884. Given that Valerus's lawsuit relates to its alleged misunderstanding regarding the intent of the Original Warrant and Interim Warrants at the time it negotiated the Amended Warrants, we reject Valerus's contention that its claims relate only to the Amended Warrants and not to the Original Warrant. The rights and obligations under the Amended Warrant have their genesis in the Original Warrant as part of the 2006 loan transaction. Because Valerus's claims relate to the Original Warrant, they are subject to the jury waivers.

Finally, regardless of whether the jury waivers are construed broadly or strictly, they apply here because their scope is neither ambiguous nor doubtful. Rather, this dispute falls within the plain language of the jury waivers because it directly "relate[s] to" an "amendment" or "modification" to the Original Warrant, which the Fee Letter expressly defines as a "Loan Document." More specifically, we conclude that a common sense reading of both jury waivers demonstrates that they apply to the underlying suit because:

The jury waiver provision in the Credit Agreement applies to any dispute "RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT."

15

The definition of "Loan Documents" in the Credit Agreement includes "other documents."

The definition of "Loan Documents" in the Credit Agreement also includes "any amendment, restatement, extension, waiver or modification of any of the foregoing."

The Interim Warrants and Amended Warrants "modified" or "amended" the Original Warrant. Therefore, all of the warrants are "Loan Documents" subject to the jury waiver.

The Amended Warrants also state that they are issued "pursuant to the Credit Agreement." Valerus's claims challenging the Amended Warrants thus relate to the original Credit Agreement and its jury waiver.

In addition, the Fee Letter is a Loan Document.

The Fee Letter memorialized the consideration for Guggenheim's role in Valerus's 2006 financing transaction.

The jury waiver in the Fee Letter applies to any action "arising out of or relating to" it or "the transactions contemplated" or actions in the "negotiation, performance or enforcement" of the Fee Letter.

The Fee Letter incorporates the Original Warrant by reference and states the Original Warrant is a Loan Document. The Original Warrant is therefore part of the Fee Letter and is a Loan Document.

Modifications and Amendments of the Loan Documents were contemplated in the 2006 transaction.

The Amended Warrants modified the Original Warrant, which is incorporated in and part of the Fee Letter. Therefore, the Amended Warrants are related to the Fee Letter.

Claims seeking rescission of the Amended Warrants thus also arise out of and are related to the Fee Letter and its jury waiver.

For these reasons, the jury waiver provisions apply to Valerus's claims challenging the Amended Warrants. Therefore, we conclude that the trial court abused its discretion in refusing to enforce the jury waiver agreements in this case, and sustain Guggenheim's issues.

16

## CONCLUSION

We hold that the jury waiver provisions in the 2006 Credit Agreement and Fee Letter apply to the underlying suit. Therefore, we conditionally grant Guggenheim's petition for writ of mandamus and direct the respondent to enforce the parties' jury waiver agreements. The writ issue only if the respondent fails to do so.

PER CURIAM

Panel consists of Chief Justice Hedges and Justices Brown and Busby.