

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-16-00025-CV

WATTS REGULATOR CO.                                    APPELLANT

V.

TEXAS FARMERS INSURANCE                                APPELLEE
COMPANY AS SUBROGEE OF
DAVID MARTINEZ

------------

FROM THE 352ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 352-277555-15

AND

### NO. 02-16-00039-CV

WATTS REGULATOR CO.                                    APPELLANT

V.

TEXAS FARMERS INSURANCE                                APPELLEE
COMPANY AS SUBROGEE OF
KADREY SEMO

------------

FROM THE 342ND DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 342-277833-15

----------

# OPINION

----------

In a single issue in these consolidated accelerated interlocutory appeals,[1] appellant Watts Regulator Co. argues that it has a right to compel appellee Texas Farmers Insurance Company, as subrogee of David Martinez and Kadrey Semo, to arbitration. We affirm.

Before the accrual of the subrogation claims in this case, both parties were members of a voluntary arbitration forum called Arbitration Forums, Inc. (AF). As members of AF, the parties did not sign a contract with each other, but, rather, separately and independently of one another, signed a two-page preprinted form prepared and furnished by AF,[2] which, according to its literature, "administrates voluntary alternative dispute resolution services for signatory companies." By signing the agreement, both parties became signatories to AF, and as voluntary signatories, agreed to arbitrate claims with AF.

The AF agreement also gave AF the power to draft rules and regulations to govern the procedures for filing cases and participating in hearings.[3] Because

---

[1]*See* Tex. Civ. Prac. & Rem. Code Ann. § 51.016 (West 2015), § 171.098 (West 2011); Tex. R. App. P. 28.1.

[2]AF's slogan, as denoted on the form, is "Industry created. Membership driven."

[3]Through AF under the rules in effect at the time these subrogation claims arose, submitted claims would generally be resolved with limited discovery,

2

membership in AF is voluntary, either party could withdraw from AF at any time by giving written notice to AF of its intent to withdraw, and withdrawal would become effective 60 days after written notification, "except as to cases then pending before arbitration panels."

On July 29, 2014, pursuant to the agreement's terms, Farmers sent a written notice to AF that it and its various entities were withdrawing from the agreement, which, under AF's terms, made Farmers's withdrawal effective 60 days later.

Approximately six months later, Farmers sued Watts on the two subrogation claims at issue here[4] based on its allegations that products manufactured by Watts caused property damage of $9,758.04 to Martinez (for damages that occurred to Martinez's property on April 23, 2013) and $14,966.14 to Semo (for damages that occurred to Semo's property on May 8, 2013). Watts then sought to compel arbitration of both claims through AF. In both cases, the trial courts denied Watts's motion to compel arbitration.

The pertinent provisions of the arbitration agreement are as follows:

By signing this Agreement, the company accepts and binds itself to the following:

---

followed by a hearing by one arbitrator unless a party requested a three-person panel and paid the three-person panel fee.

[4]Farmers brought suit as to Martinez's claim on March 26, 2015, and as to Semo's claim on April 10, 2015.

3

**Article First**
*Compulsory Provisions*

Signatory companies must forego litigation and submit any **personal, commercial, or self-insured** property subrogation <u>claims</u> to Arbitration Forums, Inc. (hereinafter referred to as AF).

**Article Second**
*Exclusions*

No company shall be required, without its **written consent**, to arbitrate any claim or suit if:

(a) it is not a signatory company nor has given **written consent**;

. . . .[5]

**Article Fourth**
*Non-Compulsory Provisions*
The parties may, with **written consent**, submit a claim:

(a) that exceeds this forum's monetary limit, or
(b) where a non-signatory wants to participate.

Once a company gives **written consent**, all Articles and Rules of this forum are applicable, and the company may not revoke its consent.

**Article Fifth**
*AF's Function and Authority*

AF, representing the signatory companies, is authorized to:

(a) make appropriate Rules and Regulations for the presentation and determination of controversies under this Agreement;

---

[5]The remaining items (b)–(h) in Article Second pertain to types of claims, policy terms, denial of coverage, claims instituted before the agreement is signed, accidents in federal or international waters, and settlement under an insurance policy. Article Third sets out rules pertinent to the arbitrator's decisions, including confidentiality, but they otherwise have no bearing on our interpretation of the agreement.

(b) determine the location, and the means by which, arbitration cases are heard;

(c) determine qualification criteria and provide for the selection and appointment of arbitrators;

(d) establish fees;

(e) invite other insurance carriers, noninsurers, or self-insureds to participate in this arbitration program, and compel the withdrawal of any signatory for failure to conform to the Agreement or the Rules issued thereunder.

**The signatories, directors, officers, staff, agents and AF employees, as well as the arbitrators, are not liable to and will be held harmless by any party (ies) for any negligence, act, or omission concerning the processing, administration, or hearing of any arbitration conducted under this Agreement.**

**Article Sixth**
*Withdrawals*

*Any* signatory company may withdraw from this Agreement by notice in writing to AF. Such withdrawal will become effective sixty (60) days after receipt of such notice <u>except as to cases then pending before arbitration panels</u>. The effective date of withdrawal as to such pending cases shall be upon final compliance with the finding of the arbitration panel on those cases. [Underlined emphases added.]

The form contains a space for "Group/Company" name, asks the signatory to indicate whether it is an insurer or is self-insured, and provides space for listing "companies['] signatory" if a member is "signing for a group."

The dispute between the parties here hinges on whether the trial courts below properly construed the AF agreement in light of Farmers's decision to withdraw from the agreement and its subsequent decision to sue Watts on the subrogated claims. Specifically, the question is whether claims that accrued prior to Farmers's decision to withdraw are nevertheless subject to arbitration through

AF even though they were not pending cases before an arbitration panel at any time during Farmers's association with AF.

Watts argues that "claims," as used in the first article of the agreement, means that any claims that accrued while Farmers was still a signatory must be arbitrated.[6] Farmers counters that the plain and specific language of the sixth article—that withdrawal is effective 60 days after notice "except as to cases then pending before arbitration panels"—means that if the claim was not pending before an arbitration panel at the time of the withdrawal plus 60 days, then it cannot later be compelled into arbitration pursuant to the AF agreement.

We review a trial court's denial of a motion to compel arbitration for an abuse of discretion. *BBVA Compass Invs. Solutions, Inc. v. Brooks*, 456 S.W.3d 711, 717 (Tex. App.—Fort Worth 2015, no pet.). A party seeking to compel arbitration must show that the claims at issue (1) are subject to a valid arbitration agreement and (2) fall within the scope of that agreement. *Id.* Because unambiguous contracts are construed as a matter of law, *Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014), we review de novo a trial court's construction of an unambiguous arbitration agreement. *See In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 643 (Tex. 2009) (orig. proceeding); *In re*

---

[6]Or, as worded by the trial judge in the Semo case and agreed to by Watts's counsel, "So [Watts's] position is essentially that once . . . a subrogation claim accrues, that the agreement can never be terminated as to that [claim]." The trial court then observed that such an interpretation would render the language about pending cases "pretty much worthless."

*Guggenheim Corp. Funding, LLC*, 380 S.W.3d 879, 886 (Tex. App.—Houston [14th Dist.] 2012, orig. proceeding [mand. dism'd]).

Watts relies on *Brooks* to support its argument that Farmers's claims must be arbitrated. In *Brooks*, the dispute between the parties involved allegations that the bank improperly transferred funds from an individual retirement account (IRA) into someone else's account and then closed the IRA account. 456 S.W.3d at 715. The bank argued that the brokerage agreement between the parties required arbitration and that the agreement was broad enough to encompass all controversies between the parties concerning the agreement's performance, while the owner of the IRA argued that the arbitration clause's scope did not encompass tortious conduct and that the parties' contractual relationship ended when the bank closed the account.[7] *Id.* at 716–17.

---

[7]The arbitration clause in that case provided, in all capital letters:

(e) . . . You agree that, except as provided below, *all controversies* which may arise between you and Compass, its affiliates, officers, directors, employees, representatives, and agents *concerning the construction, performance or breach of this agreement, agreements related hereto, or any transaction involving securities and/or your securities account, whether entered into prior to, or subsequent to the date hereof, shall be resolved by arbitration* in accordance with the Code of Arbitration Procedure of the National Association of Securities Dealers ("CAPNASD") or, if the CAPNASD is unavailable for any reason, the rules of procedure of the American Arbitration Association.

*Brooks*, 456 S.W.3d at 716–17 (emphases added).

We noted the following general rules regarding arbitration and contract construction in *Brooks*:

- An agreement to arbitrate contained within a contract survives the termination or repudiation of that contract as a whole.

- A strong presumption favors arbitration and we are to resolve any doubts about an agreement's scope, waiver, and other issues unrelated to its validity in favor of arbitration.

- Unless it can be said with positive assurance that an arbitration clause is not susceptible of an interpretation that would cover the dispute at issue, a court should not deny arbitration.

- Whether a claim falls within the scope of an arbitration agreement involves the trial court's legal interpretation of the agreement and is subject to de novo review, i.e., reviewed with no deference to the trial court's decision.

- Courts examine the language in an arbitration agreement in context and give the language its plain grammatical meaning, and when construing a contractual provision, the provision is reviewed in light of the entire contract.

*See id.* at 718–19. We clarified in *Granite Re Inc. v. Jay Mills Contracting Inc.* that when determining whether there is a valid arbitration agreement between the parties, the FAA's general presumption in favor of arbitration does not apply. No. 02-14-00357-CV, 2015 WL 1869216, at *3 (Tex. App.—Fort Worth Apr. 23, 2015, no pet.) (mem. op. on reh'g). We make that determination by applying state law contract principles, and under such principles, we primarily must determine the parties' intent as expressed in the contract's terms. *Id.* Arbitration cannot be ordered in the absence of an agreement to arbitrate. *Villa De Leon Condos., LLC v. Stewart*, No. 02-14-00271-CV, 2015 WL 729462, at *3 (Tex. App.—Fort

8

Worth Feb. 19, 2015, no pet.) (mem. op.) (citing *Freis v. Canales*, 877 S.W.2d 283, 284 (Tex. 1994) (orig. proceeding)).

We concluded in *Brooks* that the claims were subject to arbitration based on the purpose of the agreement between the parties and because their claims were both the direct and collateral results of the bank's alleged breach of their agreement. 456 S.W.3d at 719–20. We concluded in *Granite Re* that there was a valid agreement to arbitrate between a contractor and a subcontrator's surety based on the doctrine of incorporation by reference.[8] 2015 WL 1869216, at *1–2, *4. And we concluded in *Stewart* that the purchasers had agreed to and were bound by the arbitration agreement as evidenced by their agreement to the First Addendum of a condominium sales contract. 2015 WL 729462, at *4.

In contrast, here, the arbitration agreement at issue was not between Watts and Farmers as parties to a contract or parties to an overall transaction that incorporated an arbitration clause by reference. *Cf. Stewart*, 2015 WL 729462, at *4; *Granite Re*, 2015 WL 1869216, at *1–2, *4; *Brooks*, 456 S.W.3d at 719–20. Instead, each party here unilaterally signed a form provided by the arbitration forum itself, and the claims at issue were unrelated to the breach of

---

[8]Granite, the subcontractor's surety, sought to enforce the arbitration clause against the contractor; the arbitration clause was in a blanket agreement between the contractor and the subcontractor, which was incorporated into a performance bond through a work order. 2015 WL 1869216, at *1–2, *4.

9

any agreement between the parties.[9]  The arbitration agreement form expressly states that no company shall be required to arbitrate any claim or suit if it is not a signatory company unless it has given written consent.  The only provision requiring irrevocability of consent pertains to when a claim has been submitted that exceeds the forum's monetary limit or involves a nonsignatory and requires written consent to the arbitration of that claim.

The first article requires that "signatory" companies submit their claims to AF.  The second article provides that no company shall be required to arbitrate any claim or suit without its written consent if it is not a "signatory" company.  The fourth article states that irrevocability depends on written consent to submit a

---

[9]Instead, Watts was at best a third-party beneficiary to Farmers's unilateral agreement to arbitrate in AF's forum.  *Cf. In re Odyssey Healthcare, Inc.*, 310 S.W.3d 419, 421 (Tex.) (orig. proceeding) (reviewing validity of arbitration agreement between employer and employee), *cert. denied*, 562 U.S. 895 (2010); *In re Halliburton Co.*, 80 S.W.3d 566, 567–68 (Tex. 2002) (orig. proceeding) (same), *cert. denied*, 537 U.S. 1112 (2003).  To the extent Watts relies on the Federal Arbitration Act (FAA) to support its argument that Farmers could not revoke the arbitration agreement as to claims that accrued while it was a signatory, the FAA states that

> A written provision in any maritime transaction or a contract *evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter *arising out of such contract or transaction*, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy *arising out of such a contract*, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C.A. § 2 (West 2009) (emphases added).  As set out above, Watts and Farmers did not have a contract with each other.  Therefore, this provision does not support forcing Farmers into arbitration.

10

claim that involves a nonsignatory's participation. And the sixth article's withdrawal terms allow "[a]ny signatory company" to withdraw if it provides notice in writing, with the withdrawal becoming effective sixty days later "except as to cases then pending before arbitration panels."

From the above and with regard to these two subrogation claims, we cannot conclude that Watts had any vested right to arbitration or ability to enforce compulsory arbitration against Farmers sixty days after Farmers withdrew from AF. Instead, under the terms as written, when Farmers gave AF its written notice that it was withdrawing from AF, it became a "nonsignatory" company sixty days later as to all cases—and, by inference, all claims that were not yet cases[10]—that

---

[10]In the law's natural order, some claims become cases and some do not. *See* Tex. R. Civ. P. 47 ("Claims for Relief"), 202 ("Depositions Before Suit or to Investigate Claims"). And notwithstanding Watts's allegations of gamesmanship, we cannot rewrite AF's form to accommodate Watts's desire to force Farmers into arbitration. *See generally* Tex. Civ. Prac. & Rem. Code Ann. § 154.002 (West 2011) (explaining that alternative dispute resolution procedures are *voluntary* settlement procedures); *Aldridge v. Thrift Fin. Mktg., LLC*, 376 S.W.3d 877, 883 (Tex. App.—Fort Worth 2012, no pet.) ("In conducting our review, we 'may not expand upon the terms of the contract or tolerate a liberal interpretation of it by reading into it a voluntary, consensual agreement to arbitrate when one otherwise does not exist.'" (quoting *In re Bates*, 177 S.W.3d 419, 422 (Tex. App.—Houston [1st Dist.] 2005, orig. proceeding)). *Compare Claim*, Black's Law Dictionary (10th ed. 2014) (defining "claim" as a statement of something yet to be proved, the assertion of an existing right, an interest or remedy recognized at law, or "[a] demand for money, property, or a legal remedy to which one asserts a right; esp., the part of a complaint in a civil action specifying what relief the plaintiff asks for"), *with Case*, Black's Law Dictionary (defining "case" as "[a] civil or criminal proceeding, action, suit, or controversy at law or in equity <the parties settled the case>"; a criminal investigation; an individual suspect or convict in relation to any aspect of the criminal-justice system; or an argument, an instance, occurrence, or situation).

11

were not already then-pending before an arbitration panel.[11] At the time Farmers brought its claims against Watts, it was no longer a signatory. *See Aldridge*, 376 S.W.3d at 883 ("[W]e agree with Thrift that the repeated use of the terms 'Member,' 'Disputing Member,' and 'Responding Member' demonstrates that the agreement to arbitrate is an agreement solely regarding resolution of disputes between 'Members' of Thrift."). The AF arbitration agreement form's plain language addresses which *cases*—not *claims*—were still subject to arbitration upon a signatory's withdrawal. Because they were not "cases then pending before arbitration panels," these two subrogation actions did not fall within the post-withdrawal cases that would remain subject to arbitration.

Given the context, the timeline, and the plain-language reading of the arbitration agreement form, we cannot say that the trial courts in these cases abused their discretion by denying Watts's motions to compel arbitration.

---

We also note that contrary to Watts's argument that the contract is illusory if Farmers could withdraw whenever it wanted, *both* parties here—Farmers *and* Watts—had the power to withdraw pursuant to the sixth article. *Cf. Odyssey*, 310 S.W.3d at 424 (holding that limitations on employer's right to amend or terminate arbitration agreement with employee did not render agreement illusory); *Halliburton*, 80 S.W.3d at 569–70 (same).

[11]To support its argument that a pending claim is subject to compulsory arbitration at the time that it arose, Watts refers us to the AF Rules. But the rules in the record that Watts refers us to pertain to rules that became effective on January 1, 2015 and were then updated on November 10, 2015, not the rules that were in effect at the time the claims accrued or when Farmers withdrew. The rules that were effective October 1, 2012, which are also in the record, do not purport to interpret when claims accrue for mandatory arbitration purposes.

12

Therefore, we overrule Watts's sole issue and affirm the trial courts' orders denying Watts's motions to compel arbitration.

/s/ Bonnie Sudderth
BONNIE SUDDERTH
JUSTICE

PANEL:  WALKER, MEIER, and SUDDERTH, JJ.

DELIVERED:  June 30, 2016

13